Janice M. Bellucci, Esq., SBN 108911
LAW OFFICE OF JANICE M. BELLUCCI
475 Washington Boulevard
Marina Del Rey, California 90292
Tel:    (805) 896-7854
Fax:    (310) 496-5701
JMBellucci@aol.com

Attorney for Plaintiffs
John Doe #1, John Doe #2,
John Doe #3, and John Doe #4

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE #1, an individual;<br>JOHN DOE #2, an individual;<br>JOHN DOE #3, an individual; and<br>JOHN DOE #4, an individual;<br><br>              Plaintiffs,<br><br>    vs.<br><br>JOHN KERRY, in his official capacity as Secretary of State of the United States; JEH JOHNSON, in his official capacity as Secretary of Homeland Security; LORETTA LYNCH, in her official capacity as Attorney General of the United States; SARAH SALDANA, in her official capacity as Assistant Secretary of Immigration and Customs Enforcement; R. GIL KERLIKOWSKE, in his official capacity as Commissioner of U.S. Customs and Border Protection; DAVID HARLOW, in his official capacity as Acting Director of the United States Marshals Service; and DOES 1 to 20, inclusive,<br><br>              Defendants. | Case No.:<br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**[Violation of First and Fifth Amendments and the *Ex Post Facto* Clause]** |

## **INTRODUCTION**

1.      For the first time in the history of this nation, the United States Government will publicly stigmatize a disfavored minority group using a document foundational to citizenship: their United States passport.

2.      Specifically, and as more fully alleged herein, the United States Government will mandate that individuals required to register as sex offenders for an offense involving a minor (hereinafter "Covered Individuals") shall be issued passports emblazoned with a "conspicuous" "unique identifier" advertising their status as "sex offenders."  The United States has never before used passports to differentiate among citizens or to otherwise mark or stigmatize a specific group of disfavored individuals.

3.      This legislation applies in a blanket fashion to all Covered Individuals, without regard to the circumstances of their conviction, the age of their conviction, or whether the Covered Individuals pose a current risk to public safety.  For example, Covered Individuals whose passports will now publicly identify them as "sex offenders" will include individuals convicted of minor misdemeanor offenses such as "sexting" or public urination, individuals convicted of voluntary sexual contact with a girlfriend or boyfriend while both were teenagers, individuals convicted decades ago and who have never reoffended, and even individuals who are currently minors or who committed their offense while a minor.

4.      Notably, the United States Department of Justice confirms that more than 25 percent of the individuals on sex offender registries nationwide are juveniles.[1]  Many jurisdictions, including California – which has the nation's largest State sex offender

---

[1] David Finkelhor, *et al.*, *Juveniles Who Commit Sex Offenses Against Minors,* OFFICE OF JUVENILE JUSTICE & DELINQUENCY PREVENTION, JUVENILE JUSTICE BULLETIN 1, 1 (Dec. 2009), *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/227763.pdf.

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

registry[2] that treats all sex offenses with equal severity – place juveniles who commit a sex offense on the State's sex offender registry for life.

5.     As numerous examples demonstrate, compelling Covered Individuals to identify themselves as sex offenders will invite serious risk of physical harm and harassment upon Covered Individuals, their families, their business associates, and anyone with whom they are traveling, whether for personal or business reasons.  This legislation will also impose significant burdens on a Covered Individual's constitutional rights to the freedom of speech, due process, domestic and international travel, and the right to earn a living, among other unconstitutional deprivations.

6.     This civil rights action challenges the constitutionality of certain provisions of the recently enacted International Megan's Law to Prevent Demand for Child Sex Trafficking, H.R. 515 (hereinafter the "IML"), which was signed into law[3] by the President on February 8, 2016, in that, on its face, the IML violates the First Amendment and Fifth Amendment to the United States Constitution, as well as the *Ex Post Facto* Clause of the United States Constitution.

7.     Specifically, and as more fully alleged herein, the IML imposes a proverbial Scarlet Letter and compels speech in violation of the First Amendment by forcing Covered Individuals to identify themselves publicly as "sex offenders" on their United States passport, which serves both as a primary form of identification within the United States as well as an essential international travel document.

8.     Additionally, and as more fully alleged herein, the IML also establishes an international travel blacklist for Covered Individuals previously convicted, or mistakenly

---

[2] According to the California Department of Justice, there are currently more than 108,000 individuals required to register as a sex offender pursuant to California Penal Code section 290, *et seq.*  See http://www.meganslaw.ca.gov/statistics.aspx?lang=ENGLISH.  The total number of individuals in the nation who are required to register as a sex offender is over 840,000.  See National Center for Missing and Exploited Children, *Registered Sex Offenders in the United States and its Territories per 100,000 Population*, *available at* http://www.missingkids.com/en_US/documents/Sex_Offenders_Map.pdf.
[3] The Public Law number is not currently available, but will be provided to the court in a future filing.

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

believed by the government to be convicted, of a sex offense involving a minor in the United States, including individuals whose conviction is not related to sex trafficking. That is, the IML's blacklist includes individuals whose convictions involved no domestic or international travel and involved no physical contact with victims, as well as those who are no longer required to register as a sex offender in any jurisdiction.[4]  The IML's blacklist also includes individuals whose convictions pose no risk of involvement in sex trafficking such as those convicted of misdemeanors, those convicted of offenses committed while they were minors, those who are still minors, and those whose convictions have been expunged.

9.     The IML also imposes significant burdens on the rights and protected liberty interests of Covered Individuals, including the right to international travel, the right to associate with family, economic liberty, and equal protection.  Further, the IML stigmatizes Covered Individuals in a manner that substantially infringes on their protected liberty interests by communicating that Covered Individuals pose a current risk to public safety because they are engaged in, or at risk of engaging in, international child sex trafficking.

## JURISDICTION AND VENUE

10.     This is a civil rights action seeking to enjoin the implementation of Sections 4(e), 5, 6 and 8 of the IML, as well as a declaration that Sections 4(e), 5, 6, and 8 of the IML violate the First Amendment, the Fifth Amendment, and the *Ex Post Facto* Clause of the United States Constitution.

11.     This court has jurisdiction over this action under 28 U.S.C. sections 1331, 2201, and 2202; as well as 5 U.S.C. section 702, which waives the sovereign immunity

---

[4] On information and belief, the number of California residents who were previously required to register as a sex offender but who are no longer required to register exceeds 750.  On information and belief, the number of Americans who were previously required to register but who are no longer required to register exceeds 10,000.

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1    of the United States with respect to any action for injunctive relief under 28 U.S.C.

2    Section 1331.

3        12.    Under 28 U.S.C. Section 1391(e), venue is proper in this Federal district

4    because defendants are officers of agencies of the United States sued in their official

5    capacities, and because this judicial district is where Plaintiffs John Doe #1 and John

6    Doe #2 reside, and where a substantial part of the events giving rise to the claims have

7    occurred and will continue to occur.

8                                              **PARTIES**

9        13.    Plaintiff John Doe #1 is an individual residing in San Francisco, California.

10   Plaintiff John Doe #1 was convicted of a felony sex offense involving a minor over

11   twenty-five years ago and has been required to register as a sex offender in California

12   since 1994.  Plaintiff John Doe #1 serves as an officer of a corporation with facilities and

13   customers in Europe and Asia, and routinely travels to various countries within Europe

14   and Asia for business purposes.

15       14.    Plaintiff John Doe #2 is an individual residing in San Francisco, California.

16   Plaintiff John Doe #2 was convicted by plea of a sex offense in 2007 due to chatting

17   online with someone found to be a minor and/or law enforcement, without ever having

18   direct personal contact, and has been required to register as a sex offender in California

19   since 2007.  Plaintiff John Doe #2 has committed no other criminal or civil offenses, and

20   has served notably since 2009 in state and local civil rights and reentry efforts through

21   government councils, nonprofits, and public/private or faith-based community

22   organizations.  Plaintiff John Doe #2, by invitation of public healthcare representatives,

23   is active in a joint patient/provider advisory program addressing ongoing services

24   improvements and offerings for individuals and families in San Francisco

25   public/community hospitals and health care clinics.  Plaintiff John Doe #2 does not have

26   a passport, but desires to travel with his longtime partner to Mexico, Canada, Europe,

27   and other countries for business, recreational, cultural, and spiritual purposes.  Plaintiff

28

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

John Doe #2 also desires to obtain a passport as a form of primary U.S. citizen identification.

15.     Plaintiff John Doe #3 is an individual residing in Orange County, California and is a licensed attorney who was first admitted to the State Bar of California in 1991. Plaintiff John Doe #3 pled guilty to felony sex offenses involving a teenaged minor in July 1998, and was placed on probation and required to register as a sex offender. Plaintiff John Doe #3 subsequently resigned from the State Bar of California.  On September 9, 2003, the Los Angeles Superior Court reduced his convictions from felonies to misdemeanors.  On January 7, 2004, the Los Angeles Superior Court set aside Plaintiff John Doe #3's guilty verdict and dismissed his case.  Under California law, Plaintiff John Doe #3's convictions are now expunged.  On October 10, 2008, the State Bar of California reinstated Plaintiff John Doe #3 to the practice of law, and on October 23, 2011, the California Department of Justice terminated Plaintiff John Doe #3's requirement to register as a sex offender in California.  Furthermore, on January 17, 2012, the Orange County Superior Court granted Plaintiff John Doe #3's petition for a Certificate of Rehabilitation, declaring that he was rehabilitated and fit to exercise all civil and political rights of citizenship.  Therefore, under California law, Plaintiff John Doe #3 is no longer convicted of a sex offense, and is also not required to register as a sex offender in any jurisdiction.  Plaintiff John Doe #3 routinely travels to countries in Europe, Asia, and Latin America in connection with his legal representation of clients, and for other business purposes.

16.     Plaintiff John Doe #4 is an individual residing in the State of Hawaii. Plaintiff John Doe #4 served in the United States Navy for nearly 30 years and retired as a naval officer.  In 2009, Plaintiff John Doe #4 pled guilty to one count of Violation of Privacy in the First Degree in the State of Hawaii, a sex offense involving a minor, and was sentenced to a five-year term of probation, but was not required to register as a sex offender.  However, about two years after his conviction, the State of Hawaii informed

Plaintiff John Doe #4 that he would face criminal prosecution if he did not immediately register as a sex offender in that State. Despite this breach of his plea agreement, Plaintiff John Doe #4 complied. In February 2013, Plaintiff John Doe #4 was granted an early release from probation. Plaintiff John Doe #4 is married to a citizen of the Philippines who currently resides in the Philippines and who is forbidden to travel to the United States because of current visa restrictions for Filipinos. International travel to the Philippines is therefore the only means by which Plaintiff John Doe #4 can visit his wife.

17.     Plaintiffs John Doe #1, John Doe #2, John Doe #3, and John Doe #4 will be referred to collectively herein as "Plaintiffs."

18.     Defendant John Kerry is the Secretary of State of the United States and heads the United States Department of State. Defendant Kerry and the Department of State oversee the implementation of certain provisions of the IML, as set forth below.

19.     Defendant Jeh Johnson is the Secretary of the United States Department of Homeland Security and heads the Department of Homeland Security ("DHS"). Defendant Johnson and the DHS oversee the implementation of certain provisions of the IML, as set forth below.

20.     Defendant Loretta Lynch is the Attorney General of the United States and heads the United States Department of Justice ("DOJ"). Defendant Lynch and the DOJ oversee the implementation of certain provisions of the IML, as set forth below.

21.     Defendant Sarah Saldana is The Assistant Secretary for U.S. Immigration and Customs Enforcement within the DHS and, pursuant to the IML, will head the Center from which notifications regarding Covered Individuals are issued. IML § 4(c), (d).

22.     Defendant R. Gil Kerlikowske is the Commission of U.S. Customs and Border Protection within the DHS and, pursuant to the IML, is a member of the Center from which notifications regarding Covered Individuals are issued. IML § 4(d).

VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

23.     Defendant David Harlow is Acting Director of the United States Marshals Service (the "Marshals Service").  Defendant Harlow and the Marshals Service are responsible for implementing certain provisions of the IML, as set forth below.

24.     The true names and capacities of Defendants sued as Does 1 through 20 are unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Plaintiffs will seek leave to amend this Complaint, if necessary, to reflect the true names once they have been ascertained.

25.     Defendants Kerry, Johnson, Lynch, Saldana, Kerlikowske, Harlow, and Does 1 through 20 are collectively referred to herein as "Defendants."

## FACTS

**A.    International Megan's Law and International Sex Trafficking**

26.     The purported purpose of the IML is "to protect children from exploitation, especially from sex trafficking tourism, by providing advance notice of intended travel by registered child-sex offenders outside the United States to the government of the country of destination, . . . and for other purposes."  IML, Preamble and § 12.

27.     Despite its stated purpose, the IML is not rationally tailored to serve its stated interest, that is, to protect children from sex trafficking, and instead is inconsistent with currently available empirical evidence, including Federal and State government data regarding the low risk of re-offense posed by registered sex offenders for any sex crime, particularly a crime related to sex trafficking.

28.     According to Federal government data, sex trafficking and child sex tourism is a rare crime.  As stated in an earlier version of the IML introduced in 2010, the Department of Justice "obtained 73 convictions of individuals from the United States charged with committing sexual crimes against minors in other countries," an average of only 10 convictions per year during a seven-year period from 2003 through 2009.[5]

---

[5] See H.R. 5138, 111th Cong., Report No. 111-568, Part 1, § 2(a)(12), *available at* https://www.gpo.gov/fdsys/pkg/BILLS-111hr5138rh/html/BILLS-111hr5138rh.htm.

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

29.    According to state government data, most new sex offenses, including sex trafficking and child sex tourism, are not committed by people required to register as a sex offender.  The California Department of Corrections and Rehabilitation ("CDCR") cites research concluding that "first-time offenders" accounted for "95.9% of all arrests for any [registrable sex offense], 95.9% of all arrests for rape, and 94.1% of all arrests for child molestation."[6]

30.    Also according to state government data, and contrary to popular myth, the re-offense rate for individuals on a sex offender registry is extremely low.[7]  For example, the CDCR reports that the re-offense rate for California registrants on parole is 0.8 percent, the lowest re-offense rate for any crime except murder.[8]  In addition, research by Karl Hanson, Ph.D., the world-renown expert on this topic, confirms that, at five years post-offense, the re-offense rate for low-risk offenders is 2 percent, while the re-offense rate for moderate-risk offenders is 7 percent, with the risk of re-offense for both groups diminishing with each passing year.[9]

31.    The California Sex Offender Management Board ("CASOMB"), the State's policy expert on sex offender issues, has adopted research by Dr. Hanson which confirms that even <u>high</u> <u>risk</u> sex offenders who have not re-offended in 17 years are no more likely to commit a new sex offense than someone who has never committed a sex

---

[6] CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, A BETTER PATH TO COMMUNITY SAFETY 2 & n. 4 (2014) (emphasis added).

[7] While the rate at which individuals on sex offender registries recidivate by committing crimes *other* than sex offenses may be higher, recent research demonstrates that this phenomenon is largely caused by the numerous legal restrictions that destabilize the lives of registrants and impede their reintegration into society, such as presence and residency restrictions, the stigma of public sex offender registries, discrimination in employment and housing opportunities, and myriad other burdens indiscriminately imposed by legislatures, such as the provisions of the IML challenged in this action.  See Generally CALIFORNIA SEX OFFENDER MANAGEMENT BOARD, HOMELESSNESS AMONG CALIFORNIA'S REGISTERED SEX OFFENDERS: AN UPDATE (Aug. 2011).

[8] CALIF. DEPT. OF CORRECTIONS AND REHABILITATION, 2014 OUTCOME EVALUATION REPORT 30 (July 2015), *available at* http://www.cdcr.ca.gov/Adult_Research_Branch/Research_ Documents/2014_Outcome_Evaluation_Report_7-6-2015.pdf.  The exact rate was 0.8%.  Another 2% of the cases involved a violation of the sex offender registry requirements, and the remaining 5.3% of those who returned to prison committed a new offense that was not a sex crime.

[9] R. Karl Hanson, *et al.*, *High-Risk Sex Offenders May Not Be High Risk Forever*, 29 (15) J. OF INTERPERSONAL VIOLENCE 2792, 2802 (2014).

VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

offense.[10]  Further, the United States Department of Justice reports that the overall re-offense rate for all sex offenders nationwide is only 5.3 percent.[11]

32.     The IML applies to Covered Individuals regardless of the details of their offense, their actual risk of re-offense, or the age of their conviction.  Other than by limiting its application to sex offenses against minors, the IML's designation of "covered sex offender" is overbroad because it is not limited to individuals who have been convicted of sex trafficking or sex tourism, or even to those crimes that would rationally predict some risk of such an offense.  IML § 3(3), (10).  Rather, the IML applies to all Covered Individuals whose offense involved a minor.  IML § 3(3), (10).  By definition, therefore, the IML applies to individuals who are minors, or who were convicted of a misdemeanor, as well as individuals whose offenses do not involve contact with a victim, such as sexting, streaking, urinating in public, or viewing child pornography.  The IML also applies to individuals whose convictions have been expunged (e.g., Plaintiff John Doe #3), whose convictions were limited to sexual activity with another teenager, and whose convictions are decades old and therefore pose no current threat to public safety (e.g., Plaintiff John Doe #1).

33.     The IML also applies to individuals, such as Plaintiff John Doe #3, who are no longer required to register as a sex offender because they have been deemed by a state judge to be rehabilitated and therefore no longer a risk or public safety.[12]  IML § 2(3).

---

[10] R. Karl Hanson, *et al.*, *The Field Validity of Static-99/R Sex Offender Risk Assessment Tool in California*, 1 J. OF THREAT ASSESSMENT AND MGMT. 102 & n. 12 (2014).

[11] U.S. DEPT. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF SEX OFFENDERS RELEASED FROM PRISON IN 1994, at 7 (Nov. 2003).

[12] On information and belief, the number of individuals in California determined to be rehabilitated by a state judge exceeds 750.  These determinations are based upon a lengthy process, including a comprehensive evaluation of an individual by mental health professionals and state prosecutors pursuant to California Penal Code Section 290.05.

VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

34.    Finally, the IML applies to individuals in states outside of California who have automatically been removed from their state's registry due to the passage of time and absence of a subsequent offense.[13]  IML § 2(3).

35.    The purported "findings" of the IML in support of its draconian measures are predictably brief, conclusory, and (other than by exempting the government from liability) reveal no studied consideration of either the impact of the IML on public safety or the massively disruptive consequences of the IML for Covered Individuals and their families.  Specifically, the "findings" are limited to the following three observations:

a.    "Law enforcement reports indicate that known child-sex offenders are traveling internationally;"

b.    "The International Labour Organization has estimated that 1,8000,000 [*sic*] children worldwide are victims of child sex trafficking and pornography each year;" and

c.     "Child sex tourism . . . is a form of child exploitation and, where commercial, child sex trafficking."

IML § 2(4)-(6).  The IML provides no empirical evidence in any form, including facts, statistics, reports, or analyses, to justify the significant punitive burden imposed on Covered Individuals by this law, as summarized herein.

36.    Among the publicly cited bases for the IML is a sensationalistic 2012 report by the Government Accountability Office ("GAO") entitled "Passport Issuance: Current Situation Results in Thousands of Passports Issued to Registered Sex Offenders."  This document reports "that of over 16 million U.S. passports issued in 2008, about 4,500 [or

---

[13] On information and belief, the number of individuals in the nation who have been automatically removed from their state's registry due to the passage of time exceeds 10,000.  For example, the registry maintained by the State of New York, the nation's fourth-largest state registry, took effect in 1996 and imposes a 20-year registration requirement on Registrants who are assigned to either no risk classification, or to a Tier I risk classification.  See N.Y. Corrections Law § 168-h(a).  Accordingly, all New York Registrants who were assigned to either risk classification and whose registration period commenced in 1996 are no longer required to register in 2016 and beyond.

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

less than 0.03%] were issued to registered sex offenders."[14]  However, in commentary published along with the GAO report, the U.S. State Department labeled the entire report "very misleading" and stated the following:

>  a.   "Starting with the title . . . we are concerned that it conveys more 'shock value' than factual accuracy. . . . [T]he title fails to convey that GAO found no lawful reasons for the Department to deny or revoke the passports of the case study sex offenders based on their status of sex offenders."
>
>  b.   "Congress has already provided the Department authority to deny passports to individuals convicted of the crime of sex tourism involving minors and who used their passports or passport card or otherwise crossed an international border in committing an offense."
>
>  c.   "The title also fails to convey that GAO found no evidence that the offenders used their passports to commit sex offenses abroad. . . .  The report appears to suggest, without any foundation, that the Department's issuance of passports to certain Americans facilitated their commission of sex offenses abroad."[15]

## B.   The IML's "Unique Passport Identifier"

37.   The IML mandates that Covered Individuals who are required to register as a sex offender in any jurisdiction ("Registrants") will be forced to identify themselves publicly as registered sex offenders by means of a "unique identifier" on their passports. The IML defines "unique identifier" as "any visual designation affixed to a conspicuous location on the passport indicating that the individual is a covered sex offender."  IML §§ 8(a) and (b)(1), (c)(B)(2) (hereinafter, the "Passport Identifier Provision").

_____

[14] United States Government Accountability Office:  Passport Issuance – Current Situation Results in Thousands of Passports Issued to Registered Sex Offenders (June 2012), *available at* http://www.gao.gov/products/GAO-10-643.

[15] *Id*. Appendix II:  Comments from the Department of State, at 17-20 (emphasis added).

38.     Thus, for the first time in our nation's history, the Federal government will require American citizens to carry and communicate a "conspicuous" public mark – akin to the proverbial Scarlet Letter – on an object intimately associated with their person. This mark will force the individual to communicate any number of negative messages to the public about himself or herself, including that he or she poses a current threat to public safety because he or she engages in, or is at risk of engaging in, child sex trafficking.  In most cases, these messages are false and effectively force such individuals to invite significant risk of harm to themselves, their families, and others with whom they may be traveling.

39.     Subsequent to the establishment of publicly disclosed sex offender registries in or about 2006, there have been dozens of reports of vigilante reprisals, physical attacks, and even murders of individuals on sex offender registries that occurred solely because the victim was required to register as a sex offender.  For example:

    a.  In January 1995, only a few months after their State instituted its public registry, Kenneth Kerkes of Phillipsburg, NJ, and his son, Kenneth Jr., found a neighbor, Michael Groff, on that registry.  They broke into the home at Mr. Groff's address at 3 a.m. intending to beat up Mr. Groff but instead mistakenly beat up another man who was staying there.

    b.  In April 2003, Lawrence Trant downloaded a list of addresses in Concord, MA, from the public registry and proceeded to set fire to each home on the list.  Later that month, he was arrested when he confronted one of the men on his list, Lawrence Sheridan, with a baseball bat and a knife and stabbed him.

    c.  In February 2004, police in Bakersfield, CA, distributed a flyer with information from the public registry about Vincent Verdile.  About two weeks later, Gabriel Garcia went to the front door of Mr. Verdile's home

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and threatened to kill him while kicking in the door until police shot and killed Mr. Garcia to prevent his entry into Mr. Verdile's home.

d. In August 2005, Michael Mullen went to an address in Bellingham, WA, that he found listed on the public registry.  He impersonated an FBI agent in order to gain entry to the residence, where he then shot and killed two Registrants, Hank Eisses and Victor Vasquez.

e. In April 2006, Stephen Marshall took the addresses of William Elliott and Joseph Gray of Corinth, ME, from the public registry.  He first went to Mr. Elliott's home where he shot and killed him.  Then he went to Mr. Gray's home and did the same to him.  He intended to continue killing people on the public registry until he shot and killed himself when approached by police about the murders.  Mr. Elliott was on the public registry because, at age 19, he had sexual contact with his girlfriend three weeks before her 16th birthday.

f. In September 2006, Donald Keegan was charged with attempted murder for plotting to set fire to the Long Island, NY, residence of four men listed on the public registry.

g. In November 2007, Ivan Oliver of Lakeport, CA, misinterpreted information on the public registry about his new neighbor, Michael Dodele, to mean that Mr. Dodele's offense involved a minor, which it had not.  Worried for his four-year-old son's safety, he went to Mr. Dodele's home and killed him by stabbing him 65 times.

h. In August 2009, Steven Banister chose the Palm Springs, CA, address of Edward Keeley from the public registry.  He and Travis Cody went to the 75-year-old man's home, where they robbed and killed him.

i. In June 2012, Patrick Drum shot and killed Gary Blanton, who was a registered sex offender because he had sexual contact with his girlfriend

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

when he was a senior in high school and she was a freshman.  He then drove to the home of registrant Jerry Ray in nearby Agnew and fatally shot him as well.  Mr. Drum said he killed both men "because they were sex offenders" and that he had planned on killing more of them until he was caught.  In a court hearing, Mr. Blanton's widow reported that people who considered Drum a hero had stalked her home, spat on her family, and thrown things at her car.

j.  In December 2012, in San Juan Capistrano, CA, Robert Vasquez murdered Bobby Ray Rainwater after he learned that Rainwater was a registrant.  Both men lived in the same trailer park.  Mr. Rainwater was attacked from behind and was stabbed so many times he was practically decapitated.

k.  In July 22 2013, in Lockhart, SC, Jeremy Moody murdered registrant Charles Parker and his wife, Gretchen Parker, inside their home.  Mr. Moody pretended to have car problems outside the home and asked to use the couple's home phone to call a tow truck.  After his arrest, Mr. Moody told police that he killed Mr. and Mrs. Parker because Mr. Parker was a registered sex offender.

l.  In September 2015, in Redding, CA, registrant Roy Matagora was shot three times and significantly injured by Timothy Gould when Mr. Matagora opened the front door of his home.  After his arrest, Mr. Gould told police that he shot Mr. Matagora solely because he is a sex offender.

40.    Prior to the IML, obtaining information regarding registered sex offenders required an individual seeking that information to access the Internet.  However, the Passport Identifier Provision of the IML would, for the first time, compel Registrants to communicate affirmatively their status as a registered sex offender, along with numerous other false and stigmatizing messages implied by that status, to the public on an object

that they carry with them and that they are legally required to use for identification and other purposes.  As evidenced by the reports summarized above, this communication could result in serious risks of harm to Registrants, their families, their business associates, and any individuals with whom they are traveling.

41.   Tellingly, the IML exempts the relevant government officials and departments from liability arising from any harm that the Passport Identifier Provision causes to Registrants.  IML § 8(a) and (d).

**C.**   **The IML's "Notification Provision"**

42.   In addition to the Passport Identifier Provision, the IML provides that DHS shall establish a Center known as the "Angel Watch Center" within the Child Exploitation Investigations Unit of the DHS's United States Immigration and Customs Department (the "Center").  IML § 4(a).  The mission of the Center is to communicate with foreign countries regarding a Covered Individual's international travel.  The IML further provides that the Center shall be headed by the Assistant Secretary for U.S. Immigration and Customs Enforcement, shall include as its additional "members" the Commissioner of U.S. Customs and Border Protection, and certain "analysts" and "program managers" designated by the U.S. Customs and Border Protection Department or the U.S. Immigration and Customs Enforcement Department.  ILM § 4(c)-4(d).

43.   The IML operates as follows:

   a.   Self-reporting.  Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, certain Covered Registrants are required to inform law enforcement of their international travel plans "in conformity with any time and manner requirements prescribed by the Attorney General," including "any anticipated dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination country and address or other contact information therein, means and purpose of travel, and any other itinerary or other travel-related information

required by the Attorney General." IML § 6.  A Covered Registrant who
fails to inform law enforcement of his or her travel plans faces a fine or
imprisonment for a term up to ten (10) years.  IML § 8.

b. <u>Reporting by the Center.</u>  Independent of an individual's self-reporting
obligation, the Center shall also determine if individuals traveling
abroad are Covered Individuals at least "48 hours before scheduled
departure, or as soon as practicable before scheduled departure."  IML §
4(e)(1).  The Center may "transmit relevant information to the
destination country about a sex offender," and share such information
with other agencies within the United States Government.   IML §
4(e)(3).  The IML neither defines the term "relevant information . . .
about a sex offender" nor provides any guidelines about the information
to be provided to the destination country about the Covered Individual.
Further, the IML does not provide any guidelines by which the Center is
to determine whether to provide information to a destination country in
the first place.[16]

c. <u>Reporting by the Marshals Service.</u>  Independent of the Center, the
United States Marshals Service may also provide information to
destination countries regarding Covered Individuals intending to travel
there, and shall also provide information regarding Covered Registrants
to the Center and to other government agencies, "within twenty-four
hours before the intended travel, and not later than 72 hours after."  IML
§§ 4(e)(2), 5.  The IML fails to identify the information to be provided
by the Marshals Service regarding Covered Individuals, and fails to
establish guidelines for the information to be provided.  Further, the IML

---

[16] The Center is also to receive incoming notifications from foreign countries regarding individuals
with sex offenses who seek to enter the United States pursuant to provisions that are not challenged
in this action.  IML § 4(b).

fails to prescribe guidelines regarding whether such information should be provided in the first place.

    d.  <u>Provision of Information to the State Department.</u>  The Center shall also provide the United States Department of State with information regarding the status of Covered Individuals in connection with the Passport Identifier Provision discussed above.  IML § 4(e)(5).

**D.**    **Inadequacy of the IML's Notice and Redress Procedures**

    44.    Critically, the IML contains no mechanism by which Covered Individuals are to receive notice that the Center or the Marshals Service has compiled information regarding them and/or their international travel plans.  In addition, the IML contains no mechanism whereby Covered Individuals are notified that information regarding them has been communicated to one or more destination countries.

    45.    Further, the IML also contains no mechanism by which a Covered Individual is to be notified regarding the nature of the information compiled by the Center or the Marshals Service.  Finally, the IML contains no mechanism whereby the Covered Individual may identify and correct errors or omissions in the information compiled by the Center or the Marshals Service <u>before</u> that information is communicated to a destination country or countries.

    46.    By its terms, the time frame for transmission of information by the Center or the Marshals Service to a Covered Individual's destination country or countries effectively ensures that a Covered Individual will receive notice of the communication only <u>after</u> he or she has made travel plans, incurred significant expense, and has actually traveled to the destination country or countries.  Specifically, the IML provides no mechanism whereby a Covered Individual is notified of the nature of the information communicated to the destination country even after he or she has been detained and deported from the destination country.

47.     Instead, the IML provides that the Center and the United States Marshals Service shall establish procedures by which "complaints" regarding the Notification Provision shall be received and reviewed.  IML § 4(e)(7), 5(d).  However, the IML does not provide that corrective procedures shall be available or effective before any information regarding the individual is provided to the destination country or countries, or before the covered individual arrives in the destination country or countries after making travel plans, and incurring significant travel time and expenses.

48.     The corrective mechanisms of the IML Notification Provision are therefore ineffective to prevent, respond to, or otherwise remedy deprivations of the liberty interests of a Covered Individual, or the stigma or risk of harm imposed upon Covered Individuals by the information communicated about them to the destination country or countries.

**E.     The IML's Secretive Legislative History**

49.     Despite the IML's historic, controversial, and extraordinarily punitive nature, the legislation was never even once the subject of substantive debate or discussion in either the House of Representatives ("House") or the Senate.  Instead, the IML, designated as H.R. 515, was passed by a voice vote in the Senate on December 17, 2015, under a "suspension of the rules" with no discussion or debate about its historic significance.  Because there was a voice vote only, there is no permanent record of which Senators voted for or against the bill.

50.     H.R. 515 was subsequently considered in the House, again under a "suspension of the rules," which permitted the bill to be considered and passed without substantive discussion or debate regarding its historic significance.  Suspension of the rules in the House is reserved solely for noncontroversial legislation and is not to be applied to controversial legislation such as H.R. 515.  Indeed, the House vote on H.R. 515 was one in a series of eight votes taken on other bills that were truly noncontroversial, such as funding for a Veterans' memorial.  Because the IML was

considered under a suspension of the rules, a voice vote was also taken in the House and there is no record of which House members voted for or against it.

51.    The process by which the IML became law, and in particular the lack of substantive consideration or debate regarding its historic significance, bespeaks a wanton indifference toward the constitutional rights of Covered Individuals, their family members, friends, and business associates, as well as the deprivations of liberty wrought by this ill-considered legislation, which constitute multiple violations of the U.S. Constitution.

## FIRST CLAIM

### (First Amendment – Compelled Speech)

52.    Plaintiffs re-allege paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.    By requiring Covered Individuals to communicate their status publicly as registered sex offenders on their United States Passports, Defendants unconstitutionally compel the speech of Plaintiffs in violation of the First Amendment.  The Passport Identifier Provision of the IML forces Plaintiffs and other affected Registrants to invite significant harm to themselves, including physical harm, harassment, and property damage.  The Passport Identifier Provision of the IML also forces Plaintiffs and all affected Registrants to communicate messages that they do not wish to communicate, that may be false, and with which they disagree, such as that they pose a current risk for engagement in international child sex trafficking or are otherwise a current danger to public safety.  The Passport Identifier Provision of the IML also forces Plaintiffs and other affected Registrants to stigmatize themselves publicly on their personal passports, which are objects intimately associated with their persons.

54.    The injuries that Plaintiffs and other affected Registrants will suffer as a result of the Passport Identifier Provision of the IML are severe, irreparable, and ongoing, and there is no plain, adequate, complete, or speedy alternative remedies

available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

## SECOND CLAIM

### (Fifth Amendment – Substantive Due Process)

55.     Plaintiffs re-allege paragraphs 1 through 54 of this Complaint as though fully set forth herein.

56.     By enforcing the Notification and Passport Identifier Provisions of the IML against all individuals convicted of sex offenses involving a minor without regard to the details of those offenses or the current threat posed by each individual to public safety, Defendants deprive Plaintiffs and other affected Registrants of rights guaranteed by the Fifth Amendment, including the Due Process right to be free from arbitrary, unreasonable, and oppressive state action that bears no rational relationship to the State's goal of protecting the public.

57.     Plaintiffs and other affected Registrants also have a right to be free from governmental stigmatization that falsely implies that they are individuals who pose a current risk to public safety, including but not limited to a current risk for engaging in international child sex trafficking, without any reasonable basis for such stigmatization.

58.     The injuries that Plaintiffs and other affected Registrants will suffer as a result of the Notification Provision of the IML are severe, irreparable, and ongoing, and there is no plain, adequate, complete, or speedy alternative remedies available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## THIRD CLAIM

**(Deprivation of Liberty without Due Process of Law – Right to Travel)**

59.     Plaintiffs re-allege paragraphs 1 through 58 of this Complaint as though fully set forth herein.

60.     Plaintiffs and other affected Registrants have a liberty interest in traveling free from unreasonable burdens within, as well as to and from, the United States.

61.     The Notification Provision of the IML operates as an international travel blacklist list for Covered Individuals and contains no means by which Covered Individuals are notified of their designation as Covered Individuals, or the basis for the same.  In addition, the IML provides no meaningful opportunity to redress the errors and omissions communicated by Defendants regarding each Covered Individual before or after such deprivations are suffered.

62.     Further, Plaintiffs and other affected Registrants have a right to be free from governmental stigmatization that falsely implies that they are individuals who pose a current risk to public safety, including but not limited to a risk of engagement in international child sex trafficking, when such harm arises in conjunction with the deprivation of their right to travel on the same terms as other travelers, and/or the deprivation of their liberty interests under the Fifth Amendment to travel without unreasonable burdens imposed by the government.

63.     59.     The injuries that Plaintiffs and other affected Registrants will suffer as a result of the Notification Provision of the IML are severe, irreparable, and ongoing, and there are no plain, adequate, complete, or speedy alternative remedies available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

## FOURTH CLAIM

### (Deprivation of Liberty without Due Process of Law – Economic Liberty)

64.     Plaintiffs re-allege paragraphs 1 through 63 of this Complaint as though fully set forth herein.

65.     Plaintiffs and other affected Registrants have a constitutionally protected economic liberty interest, including the right to travel freely for the purpose of earning an income.  Plaintiffs John Doe #1 and John Doe #3 are required to travel internationally for business purposes, and a significant portion of their respective incomes depends upon the freedom to travel internationally.

66.     The Notification and Passport Identifier Provisions of the IML will unconstitutionally interfere with the economic liberties of Plaintiffs and other affected Registrants by operating as an international travel blacklist that unreasonably interferes with the exercise of such economic liberties.

67.     59.     The injuries that Plaintiffs and other affected Registrants will suffer as a result of the Notification and Passport Identifier Provisions of the IML are severe, irreparable, and ongoing, and there is no plain, adequate, complete, or speedy alternative remedies available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

## FIFTH CLAIM

### (Due Process – Right to Associate with the Family)

68.     Plaintiffs re-allege paragraphs 1 through 67 of this Complaint as though fully set forth herein.

69.     Plaintiffs and other affected Registrants have a constitutionally protected liberty interest in associating and being physically present with their spouses, children, and other family members.

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

70.    The Notification and Passport Identifier Provisions of the IML will unconstitutionally interfere with the right of Plaintiffs and other affected Registrants to associate with family members who reside or are otherwise present overseas because the IML operates as an international travel blacklist list that prevents Covered Individuals from traveling internationally to be with family members, including but not limited to their spouses and children.

71.    Plaintiffs and other affected Registrants also have a right to be free from governmental stigmatization that falsely implies that they are individuals who pose a current risk to public safety, including but not limited to a risk of engagement in international child sex trafficking, when such harm arises in conjunction with the deprivation of their right to associate with family members on the same terms as others, and/or the deprivation of their liberty interests under the Fifth Amendment to associate with family members without unreasonable burdens imposed by the government.

72.    The injuries that Plaintiffs and all affected Registrants will suffer as a result of the Notification Provision of the IML are severe, irreparable, and ongoing, and there is no plain, adequate, complete, or speedy alternative remedies available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

## SIXTH CLAIM

### (Equal Protection)

73.    Plaintiffs re-allege paragraphs 1 through 72 of this Complaint as though fully set forth herein.

74.    In the United States, individuals convicted of sex offenses constitute a discrete and insular minority that is uniquely subject to public and private discrimination, and whose rights are uniquely subject to unconstitutional deprivation by state action, including by state action that is motivated by malice, that is arbitrary and

capricious, that bears no rational relationship to any legitimate government purpose, and that is not sufficiently tailored to serve a legitimate government purpose.

75.     Legislation that targets individuals convicted of sex offenses involving minors therefore deserves heightened scrutiny to ensure that the purpose and effect of such legislation is constitutionally permissible.

76.     Alternatively, any legislation that specifically targets any class of individuals cannot survive constitutional scrutiny unless it is rationally related to a legitimate government purpose.

77.     The Notification and Passport Identifier provisions of the IML cannot survive any level of scrutiny because they are not rationally related to any legitimate government purpose, and are not sufficiently tailored to serve any legitimate government purpose.  Therefore, these provisions violate the Equal Protection guarantee of the Fifth Amendment.

78.     Additionally, as they apply broadly to all individuals convicted of a sex offense involving a minor without regard to the individual circumstances of those offenses or the legitimate needs of public safety, the Notification and Passport Identifier Provisions of the IML constitute arbitrary, capricious, and unreasonable government action in violation of the Equal Protection guarantee of the Fifth Amendment.

79.     The injuries that Plaintiffs and all affected Registrants will suffer as a result of the Notification and Passport Identifier Provisions of the IML are severe, irreparable, and ongoing, and there are no plain, adequate, complete, or speedy alternative remedies available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

## SEVENTH CLAIM

### (*Ex Post Facto* Clause)

80.    Plaintiffs re-allege paragraphs 1 through 79 of this Complaint as though fully set forth herein.

81.    By applying the Notification and Passport Identifier Provisions of the IML to Covered Individuals, Defendants are imposing retroactive punishment in violation of the *Ex Post Facto* Clause of the United States Constitution.

82.    By applying the Notification and Passport Identifier Provisions of the IML to Covered Individuals, including to individuals whose convictions for sex offenses have been overturned, expunged, or otherwise vacated, Defendants are imposing retroactive punishment in violation of the *Ex Post Facto* Clause of the United States Constitution.

83.    By applying the Notification Provision of the IML to Covered Individuals who are no longer required to register as sex offenders in any jurisdiction, Defendants are imposing retroactive punishment in violation of the *Ex Post Facto* Clause of the United States Constitution.

84.    The injuries that Plaintiffs and all affected Registrants will suffer as a result of the Notification and Passport Identifier Provisions of the IML are severe, irreparable, and ongoing, and there are no plain, adequate, complete, or speedy alternative remedies available to redress the violations of law committed by Defendants in this action, nor are there any available and non-futile administrative remedies available to redress the violations of law committed by Defendants.

## EIGHTH CLAIM

### (Declaratory Relief)

85.    Plaintiffs re-allege paragraphs 1 through 84 of this Complaint as though fully set forth herein.

VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

86.    An actual controversy exists between Plaintiffs and Defendants regarding the constitutionality and enforceability of the Notification and Passport Identifier Provisions of the IML.

87.    Plaintiffs are entitled to a declaration of their rights with regard to the IML's Notification and Passport Identifier Provisions.

## **PRAYER FOR RELIEF**

Pursuant to the claims alleged above, Plaintiffs seek judgment against Defendants as follows:

a.    A declaratory judgment that Sections 4(e), 5, 6 and 8 of the International Megan's Law to Prevent Demand for Child Sex Trafficking, H.R. 515, on their face, violate the First Amendment and the Fifth Amendment to the United States Constitution, as well as the *Ex Post Facto* Clause of the United States Constitution;

b.    That Defendants be enjoined in perpetuity from enforcing or giving effect to Sections 4(e), 5, 6 and 8 of the IML;

c.    That Plaintiffs recover from the Defendants all of Plaintiffs' reasonable attorneys' fees, costs and expenses of this litigation as provided by law; and

d.    That Plaintiffs recover such relief as the Court deems just and proper.

Dated:  February 9, 2016                    LAW OFFICE OF JANICE M. BELLUCCI


                                            By:   /s/ *Janice M. Bellucci*
                                            Janice M. Bellucci
                                            Attorney for Plaintiffs

VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF