UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE, TWO, et al.,

          Plaintiffs,

    v.

JOHN KERRY, et al.,

          Defendants.

Case No.  16-cv-0654-PJH

**ORDER GRANTING MOTION TO DISMISS**

      Defendants' motion for an order dismissing the above-entitled action for lack of subject matter jurisdiction and for failure to state a claim came on for hearing before this court on July 27, 2016.  Plaintiffs appeared by their counsel Janice Bellucci, and defendants appeared by their counsel Kathryn Wyer.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion.

## BACKGROUND

      This case involves a constitutional challenge to the implementation of the International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders ("IML"), Pub. L. No. 114-119, 130 Stat. 15 (Feb. 8, 2016).

A.    Legislative and Administrative Background

      The IML is the latest in a series of legislative attempts to reign in sex offenders and slow or halt sex trafficking across state lines and national borders.

1.      State and Federal Sex Offender Registration/Notification Programs

Sex offender registration and notification programs have been in place in the United States for more than 25 years.  States began to develop sex offender registration programs in the late 1980s in an attempt to protect the public, especially children, from repeat offenders.  <u>See</u> H.R. Rep. 109-218(I) at 28 (Sept. 9, 2005), 2005 WL 2210642 (Leg. Hist.).

Congress enacted the first federal standards to set minimum criteria for sex offender registration in 1994.  <u>See</u> Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act ("Wetterling Act"), Pub. L. No. 103-322, § 170101, 108 Stat. 1796 (1994); <u>see also</u> H.R. Rep. 103-392 at 6, 1993 WL 484758 (Leg. Hist.).  The Wetterling Act used the federal spending power to encourage states to adopt sex offender registration laws.  <u>See</u> <u>U.S. v. Kebodeaux</u>, 133 U.S. 2496, 2501 (2013).  It also established guidelines for states to track sex offenders, particularly when they moved to another jurisdiction.  <u>See</u> Pub. L. No. 103-322, § 170101(b)(4)-(5); <u>see also</u> H.R. Rep. 103-392 at 6.  By May 1996, all 50 states and the District of Columbia had registration systems for released sex offenders in place.  <u>See</u> H.R. Rep. 105-256 at 6 (1997), 1997 WL 584298 (Leg. Hist.).

In the early 1990s, states began enacting registry and community-notification laws to monitor the whereabouts of individuals previously convicted of sex crimes.  <u>See</u> <u>Nichols v. U.S.</u>, 136 S.Ct. 1113, 1116 (2016); <u>see also</u> <u>U.S. v. Crowder</u>, 656 F.3d 870, 872 (9th Cir. 2011).  In particular, during the mid-1990s, every state plus the District of Columbia passed a "Megan's Law" (named after 7-year-old Megan Kanka, who was raped and murdered by a neighbor).  <u>See</u>, <u>e.g.</u>, Cal. Pen. Code § 290.46 (requiring California Department of Justice to make available, on an Internet web site, certain information about persons who are required to register as sex offenders); <u>see also</u> <u>Doe v. Brown</u>, 177 Cal. App. 4th 408 (2009).

In January 1996, Congress enacted the federal Megan's Law, Pub. Law 104-145, 110 Stat 1345 (1996) (codified at 42 U.S.C. § 14071), which provided for dissemination of

1    information from state sex offender registries, and required state and local law

2    enforcement agencies to release information necessary to protect the public to federal,

3    state, and local officials responsible for law enforcement activities or for running

4    background checks pursuant to the National Child Protection Act, 42 U.S.C. § 5119, et

5    seq.

6         Also in 1996, Congress enacted the Pam Lyncher Sex Offender Tracking and

7    Identification Act of 1996 ("Lyncher Act"), Pub. L. 104-236, 110 Stat. 3093 (1996)

8    (codified at 42 U.S.C. § 14072), which required the Attorney General to establish a

9    national database (the National Sex Offender Registry or "NSOR") by which the Federal

10   Bureau of Investigation ("FBI") could track certain sex offenders, and which allowed for

11   dissemination of information collected by the FBI as necessary to protect the public, and

12   provided for notification of the FBI and state agencies when certain sex offenders moved

13   to other jurisdictions.

14        In 1997, Congress enacted the Jabob Wetterling Improvements Act, Pub. Law No.

15   105-119, 111 Stat. 2441 (1997), which amended the Wetterling Act, the Lyncher Act, and

16   other federal statutes, by adding requirements regarding sex offender registration and

17   tracking.

18         Both the Supreme Court and the Ninth Circuit have upheld sex offender registry

19   and notification requirements against various constitutional challenges.  See, e.g., Smith

20   v. Doe, 538 U.S. 84, 105-06 (2003); Conn. Dep't of Pub. Safety v. Doe, 538 U.S. 1, 7

21   (2003); Litmon v. Harris, 768 F.3d 1237 (9th Cir. 2014); U.S. v. Juvenile Male, 670 F.3d

22   999, 1012 (9th Cir. 2014);  Am. Civ. Liberties Union of Nev. v. Masto, 670 F.3d 1237 (9th

23   Cir. 2012); Doe v. Tandeske, 361 F.3d 594, 597 (9th Cir. 2004).

24        2.    SORNA

25        In 2006, Congress moved towards a comprehensive set of federal standards to

26   govern state sex offender registration and notification programs by enacting the Sex

27   Offender Registration and Notification Act ("SORNA"), part of the Adam Walsh Child

28   Protection and Safety Act. Pub. L. No. 109-248, §§ 102-155, 120 Stat. 587 (codified in

United States District Court
Northern District of California

3

part at 42 U.S.C. §§ 16901 et seq.); see H.R. Rep. 109-218(I), at 27 (emphasizing "gaps and problems with existing Federal and State laws" due to "lack of uniformity" in state registration requirements and notification obligations); see also Nichols, 136 S.Ct. at 1119 (SORNA was intended to "make more uniform what had remained 'a patchwork of federal and 50 individual state registration systems,' with 'loopholes and deficiencies' that had resulted in an estimated 100,000 sex offenders becoming 'missing' or 'lost[ ]'") (citation omitted).

Congress enacted SORNA (which replaced the Wetterling Act in part) "[i]n order to protect the public from sex offenders and offenders against children . . . ." 42 U.S.C. § 16901. To this end, SORNA established "a comprehensive national system for the registration of those offenders." Id. SORNA "requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries." Reynolds v. U.S., 132 S.Ct. 975, 978 (2012). SORNA also makes it a crime for a person who is "required to register" under the Act and who "travels in interstate or foreign commerce" to knowingly fail to register or update a registration. Id. (citing 18 U.S.C. § 2250(a)).

As spending clause legislation, SORNA conditions full Byrne Justice Assistance Grant funding on a state's substantial implementation of certain requirements. See 42 U.S.C. § 16925(a) (states that fail to substantially implement the federally mandated requirements, as determined by the Attorney General each year, "shall not receive 10 percent of the [criminal justice funding from the federal government] that would otherwise be allocated for that fiscal year . . . .").

SORNA requires state registries to collect specific information, such as names, addresses, physical descriptions, criminal history information, and photographs of offenders. Id. § 16914(a), (b). It also sets minimum periods of registration based on the nature and seriousness of the sex offense and the offender's history of recidivism, see id. §§ 16911(2)-(4), 16915, and requires that a state notify certain federal agencies and

4

United States District Court
Northern District of California

1  other jurisdictions regarding its registrants, id. § 16921.  In addition, SORNA provides for

2  public dissemination of certain information on Internet sites.  Id. § 16918.

3       At the federal level, SORNA directs the Attorney General, Secretary of State, and

4  Secretary of Homeland Security to "establish and maintain a system for informing the

5  relevant jurisdictions about persons entering the United States who are required to

6  register." 42 U.S.C. § 16928.  SORNA also reauthorized the NSOR, which includes

7  information about all individuals required to register in any state registry, id. § 16919, and

8  the National Sex Offender Public Website that allows anyone to search for such

9  information by name or within specified areas, id. § 16920; see http://www.nsopw.gov.

10  SORNA identified USMS as the federal agency primarily responsible for enforcing sex

11  offender registration requirements.

12       3.     SORNA Guidelines and USMS International Notification Efforts

13       Pursuant to Congress' directive in SORNA, 42 U.S.C. § 16912(b), the Attorney

14  General issued National Guidelines for Sex Offender Registration and Notification

15  ("SORNA Guidelines") in July 2008.  See 73 Fed. Reg. 38030 (July 2, 2008), 2008 WL

16  2594934 (F.R.)[1].  In issuing these Guidelines, the Attorney General noted that the

17  effectiveness of registration and notification systems in states and other non-federal

18  jurisdictions "depends on . . . effective arrangements for tracking of registrants as they

19  move among jurisdictions," and that without such tracking, a registered sex offender

20  could "simply disappear from the purview of the registration authorities by moving from

21  one jurisdiction to another." 73 Fed. Reg. at 38045.  The original SORNA Guidelines

22  were in large part aimed at strengthening the nationwide network of registration programs

23  in order to avoid that result.  Id.

24       Moreover, while "[a] sex offender who moves to a foreign country may pass

25  beyond the reach of U.S. jurisdictions," including any jurisdiction's registration

26  requirements, "effective tracking of such sex offenders remains a matter of concern to the

27  _____

28  [1]  These are also referred to as "SMART Guidelines." See U.S. v. DeJarnette, 741 F.3d
971, 976 (9th Cir. 2013).

1   United States." Id. at 38066.  Not only may such sex offenders return to the United

2   States, but, as part of any "cooperative efforts between the Department of Justice"

3   (including the USMS) and agencies of foreign countries, "foreign authorities may expect

4   U.S. authorities to inform them about sex offenders coming to their jurisdictions from the

5   United States, in return for their advising the United States about sex offenders coming to

6   the United States from their jurisdictions." Id.  Accordingly, the original SORNA

7   Guidelines direct state registries to require registrants to notify the registry if they intend

8   to live, work, or attend school outside the United States; the registry in turn is required to

9   notify the USMS.  See id. at 38067.

10      In May 2010, in a notice of proposed supplemental Guidelines, the Attorney

11   General indicated that federal agencies were continuing to develop "a system for

12   consistently identifying and tracking sex offenders who engage in international travel,"

13   and that in furtherance of that effort, he was adding a requirement to the Guidelines that

14   registrants "must be required to inform their residence jurisdiction of intended travel

15   outside of the United States at least 21 days in advance of such travel."  75 Fed. Reg.

16   27362-02, 27364 (May 14, 2010), 2010 WL 1923569 (F.R.).  Final supplemental

17   Guidelines, with this requirement, were issued in January 2011.  76 Fed. Reg. 1630-01,

18   1637-38 (Jan. 11, 2011), 2011 WL 65547 (F.R.).

19      As explained in the Declaration of Eric Mayo ("Mayo Decl.") (Doc. 30-1), ¶¶ 3-10,

20   the international notification efforts that the Attorney General referenced were underway

21   by 2011, involving joint operations by USMS, in cooperation with the United States'

22   INTERPOL bureau, pursuant to USMS's law enforcement authorities under 42 U.S.C.

23   § 16941(a) and 18 U.S.C. § 2250.  USMS primarily uses advance notifications provided

24   by registered sex offenders, when available, as well as information obtained from DHS

25   derived from a comparison of passenger data with information in NSOR, to identify

26   registered sex offenders about to travel outside the United States, and to notify foreign

27   authorities in the destination country regarding the travel plans of these individuals.  See

28   Mayo Decl. ¶¶ 5-8.

United States District Court
Northern District of California

4.    Previous Federal Efforts to Address Child Sex Trafficking/Tourism Abroad

In addition to its concerns regarding the dangers posed by registered sex offenders who travel internationally, Congress has also long recognized the specific problems of international child sex trafficking and child sex tourism.  In 1910, Congress enacted the White-Slave Traffic (Mann) Act, which among other things prohibits the transport of minors in foreign commerce for the purpose of prostitution.  See Act of June 25, 1910, ch. 395, 36 Stat. 825 (1910) (codified as amended at 18 U.S.C. §§ 2421-2424).

In 1994, Congress amended the Mann Act by adding a provision criminalizing travel to another country for the purpose of engaging in sexual activity with a minor.  Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796 (1994) (codified as amended at 18 U.S.C. § 2423(b)); see United States v. Bredimus, 234 F. Supp. 2d 639, 644 (N.D. Tex. 2002) (upholding § 2423(b) as valid exercise of Congressional power under Commerce Clause, which is "broad enough to include individuals who travel in foreign commerce for the purpose of engaging in sexual activity with minors"), aff'd, 352 F.3d 200 (5th Cir. 2003).

Despite these efforts, Congress has determined that individuals from the United States continue to engage in child sex tourism.  See H.R. Rep. 107-525 (June 24, 2002), 2002 WL 1376220 (Leg. Hist.) ("child-sex tourism is a major component of the worldwide sexual exploitation of children and is increasing[;]" due to limited resources of foreign governments in combating such offenses, "[t]he Justice Department, Federal law enforcement agencies, the State Department and other U.S. entities expend significant resources assisting foreign countries most afflicted with sex tourism to improve their domestic response to such criminal offenses").

In 2007, DHS initiated an international notification program specifically focused on the risk of sex offenders crossing international borders in order to engage in child sex tourism.  See Declaration of Acting Deputy Assistant Director of DHS Cyber Crimes Division Patrick J. Lechleitner ("Lechleitner Decl.") (Doc. 30-2), ¶ 5.  The program, known as "Operation Angel Watch," originated in the Los Angeles office of ICE Homeland Security Investigations ("HSI"), and focused on individuals traveling from Los Angeles

International Airport to Southeast Asian countries known for sex tourism.  Id.  In 2010, the Operation Angel Watch program was transferred to ICE HSI national headquarters.  Id.

The purpose of Operation Angel Watch is to identify individuals who have been convicted of sexual crimes against children and who have upcoming travel plans, and, when appropriate, to notify law enforcement and/or border security officials in the destination country.  Id. ¶ 6.  Operation Angel Watch operates under the law enforcement authority of Title 19 of the United States Code, and bilateral agreements with foreign governments.  Id. ¶ 7; see 19 U.S.C. § 1589a (authorizing "customs officers" – which include ICE HSI Special Agents, see 19 U.S.C. § 1401(i) – to investigate any violation of federal law, including violations of 18 U.S.C. § 1591 (sex trafficking of children or by force, fraud, or coercion), 18 U.S.C. § 2251 (sexual exploitation of children), and 18 U.S.C. § 2423 (discussed above)); 19 C.F.R. § 103.33 (providing authorization, pursuant to 18 U.S.C. § 1628(a)(1), to customs officers to exchange information or documents with foreign customs and law enforcement agencies if necessary to "[e]nsure compliance with any law or regulation enforced or administered by [DHS]").

Operation Angel Watch compares passenger information received from carriers pursuant to 19 C.F.R. § 122.75a (via electronic departure manifest) with NSOR data to identify registered sex offenders whose offenses involved child victims, and it provides notifications to destination countries when it determines, based on an assessment of various factors, that there is a likelihood of intent to engage in child sex tourism. Lechleitner Decl. ¶¶ 8-11.  According to ICE News Releases in June 2015 and February 2016, ICE HSI, through Operation Angel Watch, provided notice of travel from the United States of approximately 2,300 convicted child sex offenders in 2014, and 2,100 such offenders in 2015.

5.    International Megan's Law

The purpose of the IML, which was signed into law on February 8, 2016, is to "protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism."  IML, Preamble.  "Law enforcement reports indicate that known child-

sex offenders are traveling internationally[,]" and that "[t]he commercial sexual exploitation of minors in child sex trafficking and pornography is a global phenomenon," with millions of child victims each year.  IML §§ 2(4), (5); 42 U.S.C. § 16935(4), (5).

The SORNA provisions of the 2006 Adam Walsh Act were intended to "protect children and the public at large by establishing a comprehensive national system for the registration and notification to the public and law enforcement officers of convicted sex offenders."  IML § 2(3); 42 U.S.C. § 16935(3).  The IML strengthens and further integrates the previously-existing USMS notification program and Operation Angel Watch, and seeks to close a loophole that otherwise allows registered sex offenders to evade such notifications.

SORNA ("Sex Offender Registration and Notification") and the IML ("Advanced Notification of Traveling Sex Offenders") are codified at Part A and Part A-1, respectively, of Chapter 151, Subchapter 1 ("Sex Offender Registration and Notification") of Title 42 of the U.S. Code.

In the present action, plaintiffs challenge the "passport identifier" provisions and "notification" provisions of the IML.  The nature of plaintiffs' constitutional challenge is not specified in the FAC, and was not apparent as of the hearing on the prior motion for preliminary injunction.  Plaintiffs' position in their opposition to the present motion is that they are mounting a facial challenge to the passport identifier provisions and an as-applied challenge to the notification provisions.  However, at the hearing on the motion, plaintiffs' counsel characterized the challenge to both provisions as "facial."

(a)     Passport identifier provisions

Under existing procedures, a sex offender who provides notice of travel to one country will appear on a flight manifest as traveling to that country, but might then travel from that first destination country to a different destination without detection by U.S. authorities.  Focusing specifically on registered sex offenders whose offenses involved child victims, the IML prevents such offenders "from thwarting I[ML] notification procedures by country hopping to an alternative destination not previously disclosed," by

9

United States District Court
Northern District of California

1    directing the State Department to "develop a passport identifier" that would allow such

2    individuals to be identified once they arrive at their true destination.  See 162 Cong. Rec.

3    H390 (daily ed. Feb. 1, 2016) (statement of Rep. Smith).

4         Section 4 of the IML provides for the establishment, by the Secretary of Homeland

5    Security, of an "Angel Watch Center" within the Child Exploitation Investigations Unit of

6    ICE.  IML § 4(a); 42 U.S.C. § 16935b(a).  The IML tasks the Angel Watch Center with

7    determining whether "individuals traveling abroad are listed on the [NSOR]" or whether

8    they meet the criteria for inclusion on the NSOR, and providing the USMS with a list of

9    such individuals to determine compliance with SORNA.  Id. § 4(e); 42 U.S.C.

10   § 16935b(e).

11        The IML also provides that the Angel Watch Center shall "provide a written

12   determination to the Department of State regarding the status of an individual as a

13   covered sex offender . . . when appropriate."  IML § 4(e)(5); 42 U.S.C. § 16935b(e)(5).

14   For purposes of IML § 4, the term "sex offender" means either a "covered sex offender"

15   (defined as "an individual who is a sex offender by reason of having been convicted of a

16   sex offense against a minor," see IML § 3(3), 42 U.S.C. § 16935a(3)), or "an individual

17   required to register under the sex offender registration program of any jurisdiction or

18   included in the [NSOR], on the basis of an offense against a minor" (as defined in IML

19   § 4(f), 42 U.S.C. § 16935b(f)).

20        IML § 8 amends Title II of P.L. 110-457 by adding § 240, "Unique Passport

21   Identifiers for Covered Sex Offenders."  Upon receiving a written determination from the

22   Angel Watch Center that an individual is a "covered sex offender" – here defined as any

23   individual who is a sex offender under IML § 4(f), and who is currently required to register

24   under the sex offender registration program of any jurisdiction, see 22 U.S.C. § 212b(c) –

25   the Secretary of State shall not issue a passport to any such individual unless it includes

26   a "unique identifier," and may revoke a passport previously issued without such an

27   identifier of a covered sex offender.  22 U.S.C. § 212b(b).   "Unique identifier" is defined

28   as "any visual designation affixed to a conspicuous location on the passport indicating

10

1    that the individual is a covered sex offender."  22 U.S.C. § 212b(b), (c)(2)).

2        The passport identifier provisions are not yet in effect.  IML § 8 directs the

3    Secretary of State to take the specified action(s) only upon receipt of the written

4    determination from the Angel Watch Center "through the process developed for that

5    purpose under [IML § 9]."  The passport-identifier provisions will become effective "upon

6    certification by the Secretary of State, the Secretary of Homeland Security, and the

7    Attorney General that the process developed and reported to the appropriate

8    congressional committees under [§ 9 of the IML] has been successfully implemented."

9    See 22 U.S.C. § 212b(f).

10       In turn, IML § 9 directs the State Department, the Department of Justice ("DOJ"),

11   and DHS to develop a plan to implement the passport identifier provisions (as well as the

12   notification provisions) – specifically, to describe the proposed process, provide a timeline

13   and plan for implementation of the process, and identify the resources required to

14   effectively implement the process – and to submit the plan to eight separate

15   congressional committees.  IML § 9; 42 U.S.C. § 16935f.  The Secretaries of DHS and

16   State, and the Attorney General, are thereafter required to report to and consult with the

17   appropriate congressional committees.  See 42 U.S.C. § 16935f(a), (b); see also

18   Declaration of Jonathan M. Rolbin ("Rolbin Decl.") (Doc. 30-3), ¶ 4.

19              (b)    Notification provisions

20       The Operation Angel Watch and USMS notification schemes currently in effect

21   utilize procedures to identify only registered sex offenders who travel, and do not make

22   notifications regarding persons not currently subject to registration requirements.  See

23   Lechleitner Decl. ¶ 12; Mayo Decl. ¶¶ 5, 7-8.   As indicated above, the IML builds on the

24   existing notification programs in order to provide advance notice to other countries when

25   registered sex offenders in the United States intend to travel internationally, while also

26   encouraging reciprocal arrangements with foreign governments to receive notifications

27   from those countries when sex offenders seek to travel to the United States.  See IML

28   Preamble & § 7; see also Lechleitner Decl. ¶¶ 4-7; Mayo Decl. ¶¶ 3-5, 10.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Angel Watch Center established by IML § 4(a) is intended to continue the

2    activities of the former Operation Angel Watch.  See Lechleitner Decl. ¶ 14.  Among other

3    things, the IML provides that where the Angel Watch Center has identified internationally

4    traveling individuals convicted of sexual offenses against minors, and where certain

5    conditions are satisfied, the Center "may transmit relevant information to the destination

6    country about [the] sex offender."  See IML § 4(e)(1)-(3); 42 U.S.C. § 16935b(e)(1)-(3).

7    The IML also continues USMS's notification program, see Mayo Decl. ¶ 10,

8    providing that USMS, through its National Sex Offender Targeting Center, "may . . .

9    transmit notification of international travel of a sex offender to the destination country of

10   the sex offender, including to the visa-issuing agent or agents" of the destination country,

11   and also may "share information relating to traveling sex offenders with other Federal,

12   State, local, and foreign agencies and entities, as appropriate."  See IML § 5(a)(1), (2); 42

13   U.S.C. § 16935c(a)(1), (2)).

14   Such notifications may be transmitted "through such means as are determined

15   appropriate" by USMS, "including through the INTERPOL notification system and through

16   Federal Bureau of Investigation Legal attaches."  Id. § 5(e); 42 U.S.C. § 16935c(e).  In

17   addition, USMS may "receive incoming notifications concerning individuals seeking to

18   enter the United States who have committed offenses of a sexual nature."  Id. § 5(a)(3);

19   42 U.S.C. § 16935c(a)(3)).  Any such incoming notification must be provided immediately

20   to DHS.  Id.

21   The notification provisions in IML § 4 (Angel Watch Center) and IML § 5 (USMS)

22   apply to individuals who have been convicted of a sex offense against a minor as well as

23   to those required to register with a sex offender registry on the basis of an offense

24   against a minor.  IML §§ 4(f), 5(h); 42 U.S.C. §§16935b(f), 16935c(h).

25   Where either the Angel Watch Center or USMS decides not to transmit a

26   notification abroad regarding a sex offender who intends to travel, the IML directs that it

27   collect relevant data regarding that decision.  IML §§ 4(e)(6)(C), 5(f)(3); 42 U.S.C.

28   §§ 16935b(e)(6)(C), 16935c(f)(3).  Both the Angel Watch Center and USMS are also

1    directed to establish mechanisms to receive, review, and respond to complaints from

2    individuals "affected by erroneous notifications[;]" to take action to ensure that a

3    notification or information regarding the individual is not erroneously transmitted to a

4    destination country in the future; and to provide annual reports to the "appropriate

5    congressional committees" as to the number of erroneous notifications and the actions

6    taken to prevent similar errors from occurring in the future.   IML §§ 4(e)(7), 5(g); 42

7    U.S.C. §§ 16935b(e)(7),  16935c(g).

8    B.      The Present Action

9            This case is brought by seven DOE plaintiffs.  DOE #1 was convicted of a felony

10   sex offense involving a minor over 25 years ago, and has been required to register as a

11   sex offender in California since that time.  He serves as an officer of a corporation with

12   facilities and customers  in Europe and Asia, and alleges that he routinely travels to

13   Europe and Asia for business purposes.  FAC ¶ 13.

14           DOE #2 was convicted by plea of a sex offense resulting from chatting on line with

15   a minor and/or with law enforcement, and has been required to register as a sex offender

16   since 2007.  He claims that he has been convicted of no other criminal offenses.  He

17   does not have a passport but wants to travel outside of the U.S. for business,

18   recreational, cultural, and spiritual purposes.  He also wants to obtain a passport as a

19   form of primary U.S. citizen identification.  FAC ¶ 14.

20           DOE #3 is an attorney who was admitted to practice in California in 1991.  In July

21   1998, he pled guilty to felony sex offenses involving a minor, and was placed on

22   probation and required to register as a sex offender.  In September 2003, his convictions

23   were reduced from felonies to misdemeanors.  The Los Angeles Superior Court

24   subsequently set aside the guilty verdict and dismissed the case.  He asserts that the

25   convictions are now considered expunged.  He was reinstated by the State Bar in

26   October 2008, and on October 23, 2011, the California Department of Justice allegedly

27   terminated his obligation to register as a sex offender in California.  FAC ¶ 15.

28           DOE #4 served in the U.S. Navy for nearly 30 years and retired as a naval officer.

United States District Court
Northern District of California

In 2009, he pled guilty to a sex offense involving a minor.  He claims that pursuant to a plea agreement, he was sentenced to five years of probation, but was not required to register as a sex offender.  Nevertheless, two years after his conviction, he was informed by his state of residence that he would face criminal prosecution if he did not register as a sex offender.  In February 2013, he was granted an early release from probation.  He is married to a citizen of the Philippines, who currently resides there, and who is allegedly unable to travel to the U.S. because of visa restrictions.  Thus, DOE # 4 asserts, international travel is the only way he can visit his wife.  FAC ¶ 16.

DOE #5 is required to register as a sex offender based on an offense involving a minor that occurred in 2002.  He claims that he has committed no other criminal or civil offense.  He is employed full time as a pilot for an airline that transports cargo to and from various locations throughout the world.  Because he does not know in advance which country or countries he will be flying to, he asserts that he will be unable to provide the government with 21 days advance notice of his international travel.  FAC ¶ 17.

DOE #6 is required to register as a sex offender based on a 2005 conviction for an offense involving a minor.  He claims that he has committed no other criminal or civil offense, and that he is employed full time.  He married a citizen of Taiwan in August 2009.  He and his wife lived in Guam for a year, and traveled to Taiwan to visit family members.  However, when he and his wife attempted to re-enter the U.S. together, his wife was denied entry.  He made eight trips to Taiwan between 2010 and 2013, but in June 2013 he was denied entry.  He claims that the reason given for the denial of entry was "information from the U.S. Government," and that he was told by Taiwanese authorities that he would not be permitted to re-enter Taiwan (where his wife lives) for five to ten years.  FAC ¶ 18.

DOE #7 was born in Iran and moved to California in 1979.  He is required to register as a sex offender due to a conviction for an offense involving a minor in 2010.  He asserts that he is the only child of his father, and will inherit his father's property when his father dies but that in order to receive that inheritance, he will be required to travel to

United States District Court
Northern District of California

1     Iran.  He believes that because Iran subscribes to the theory that sex offenders must be

2     killed, he himself will be killed upon entry into Iran if the U.S. notifies Iran that he has

3     been convicted of a sex offense or adds an identifier to his passport.  FAC ¶ 19.

4          Defendants are U.S. Secretary of State John Kerry; Secretary of the Department

5     of Homeland Security ("DHS") Jeh Johnson; U.S. Attorney General Loretta Lynch;

6     Assistant Secretary of Immigration and Customs Enforcement ("ICE") Sarah Saldana;

7     Commissioner of U.S. Customs and Border Protection ("CBP") R. Gil Kerlikowske; and

8     Acting Director of the U.S. Marshals Service ("USMS") David Harlow.  All defendants are

9     sued in their official capacities only.

10         The complaint was filed on February 9, 2016.  On March 9, 2016, plaintiffs filed a

11    first amended complaint ("FAC"), asserting the following claims under the First and Fifth

12    Amendments to the United States Constitution and the Ex Post Facto Clause –

13         (1) a claim alleging that the requirement that "covered individuals" publicly

14    communicate their status as convicted sex offenders on their passports will result in

15    "compelled speech," in violation of the First Amendment, FAC ¶¶ 56-57;

16         (2) a claim alleging that enforcement of the passport identifier and

17    notification provisions will result in a violation of substantive due process and

18    infringement of the right to be free from "governmental stigmatization," in violation of the

19    Fifth Amendment, FAC ¶¶ 59-61;

20         (3) a claim alleging that implementation of the notification provision will

21    result in a restriction of the liberty interest inherent in the right to travel within the United

22    States, as well as internationally, and a violation of procedural due process and

23    infringement of the right to be free from "governmental stigmatization," in violation of the

24    Fifth Amendment, FAC ¶¶ 63-66;

25         (4) a claim alleging that implementation of the passport identifier and

26    notification provisions will result in deprivation of the liberty interest in traveling for the

27    purposes of earning an income, and a violation of procedural due process and

28    infringement of the right to be free from "governmental stigmatization," in violation of the

Fifth Amendment, FAC ¶¶ 68-70;

(5) a claim alleging that implementation of the passport identifier and notification provisions will result in deprivation of the liberty interest inherent in the right to associate with family, and a violation of procedural due process and the right to be free from "governmental stigmatization," in violation of the Fifth Amendment, FAC ¶¶ 72-75;

(6) a claim alleging that implementation of the passport identifier and notification provisions will result in a violation of equal protection, in violation of the Fifth Amendment, FAC ¶¶ 77-82;

(7) a claim alleging that applying the passport identifier and notification provisions constitutes retroactive punishment, particularly as to individuals who are no longer required to register as sex offenders in any jurisdiction, in violation of the Ex Post Facto Clause, FAC ¶¶ 84-87; and

(8) a claim for declaratory relief, seeking a declaration of rights as to the notification and passport identifier provisions, FAC ¶¶ 89-90.

Plaintiffs seek an order enjoining the implementation of IML §§ 4(e), 5, 6, and 8, and a declaration that those sections violate the First and Fifth Amendments and the Ex Post Facto Clause. Defendants argue that the FAC should be dismissed for lack of subject matter jurisdiction and for failure to state a claim.

## DISCUSSION

A.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

1.   Legal standard

Federal courts may adjudicate only actual cases or controversies, see U.S. Const. Art. III, § 2, and may not render advisory opinions as to what the law ought to be or affecting a dispute that has not yet arisen. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937). Because Article III's "standing" and "ripeness" requirements limit subject matter jurisdiction, they are properly challenged under a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss. Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1122 (9th Cir. 2010); see also Bender v. Williamsport Area

United States District Court
Northern District of California

Sch. Dist., 475 U.S. 534, 541 (1986).  The burden of establishing standing and ripeness rests on the party asserting the claim.  Renne v. Geary, 501 U.S. 312, 316 (1991).

The "irreducible constitutional minimum" of standing consists of three elements. Spokeo Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id.  "As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint . . . ." Yamada v. Snipes, 786 F.3d 1182, 1203-04 (9th Cir. 2015); see also Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1171 (9th Cir. 2002).  A plaintiff is required to demonstrate standing for each claim he seeks to press, and for each form of relief sought.  DaimlerChrysler Corp. v. Cono, 547 U.S. 332, 352 (2006).

The ripeness doctrine prevents premature adjudication.  It is aimed at cases that do not yet have a concrete impact on the parties arising from a dispute, in an analysis similar to the injury-in-fact requirement under the standing doctrine.  Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 (1985).  Standing is primarily concerned with who is a proper party to litigate a particular matter, while ripeness addresses when that litigation may occur.  Bova v. City of Medford, 564 F.3d 1093, 1096 (9th Cir. 2009).

A Rule 12(b)(1) motion may be either facial or factual.  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004).  A facial 12(b)(1) motion involves an inquiry confined to the allegations in the complaint, whereas a factual 12(b)(1) motion permits the court to look beyond the complaint to extrinsic evidence.  Id.  When a defendant makes a facial challenge, all material allegations in the complaint are assumed true, and the court must determine whether lack of federal jurisdiction appears from the face of the complaint itself.  Thornhill Publ'g Co. v. Gen'l Tel. Elec., 594 F.2d 730, 733 (9th Cir. 1979).

2.    Defendants' motion

Defendants argue that the FAC should be dismissed for lack of subject matter jurisdiction, because plaintiffs have not established that they have standing to challenge

17

1    the passport identifier and notification provisions, and because the challenge to the

2    passport identifier provision is not ripe.

3               a.    Standing

4          Defendants contend that plaintiffs lack standing to challenge the passport identifier

5    and notification provisions.  As indicated above, to establish standing, a plaintiff must

6    allege that he/she suffered an injury in fact, that is fairly traceable to the challenged

7    conduct, and which is likely to be redressed by a favorable decision.  Spokeo, 136 S.Ct.

8    at 1547.

9          Defendants assert that plaintiffs have not alleged an injury in fact sufficient to

10   establish standing.  To establish injury in fact, a plaintiff must show that he/she suffered

11   "an invasion of a legally protected interest" that is "concrete and particularized" and

12   "actual or imminent, not conjectural or hypothetical."  Id. at 1548 (quoting Lujan, 504 U.S.

13   at 560).  Further, because plaintiffs seek only injunctive and declaratory relief, they must

14   identify an "imminent prospect of future injury."  Ervine v. Desert View Reg'l Med. Ctr.

15   Holdings, LLC, 753 F.3d 862, 868 (9th Cir. 2014).  Such a future injury must be "certainly

16   impending to constitute injury in fact," and allegations of "possible future injury" are not

17   sufficient.  Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1147 (2013).

18         Here, defendants contend, plaintiffs have failed to identify a "certainly impending"

19   future injury caused by the passport identifier and notification provisions.  Defendants

20   argue that plaintiffs fail to identify specific international travel plans, and that their

21   asserted injuries necessarily rely on pure speculation regarding how another country

22   might respond to an Angel Watch Center or USMS notification.[2]

23   _____

24   [2]  Defendants contend that to the extent plaintiffs rely on their individual circumstances to
     support standing, such reliance is unavailing because none of the plaintiffs has identified
25   a "certainly impending" injury.  DOE #1 refers to "routine" travel, but identifies no specific
     travel plans, see FAC ¶ 13; DOE #2 does not possess a passport and cites no specific
26   plan to obtain one, FAC ¶ 14; DOE #3 is no longer required to register as a sex offender
     in any jurisdiction, FAC ¶ 15, so he is not subject to international notifications; DOE #4
27   states that he is currently able to visit the Philippines – the only country he seeks to visit –
     without restriction, Declaration of DOE #4 at ¶ 20; DOE # 5 claims he cannot provide 21
28   days' advance notice of international travel, FAC ¶ 17, but the IML does not impose such
     a requirement; DOE # 6 states that he is barred from traveling to Taiwan – the only

United States District Court
Northern District of California

1       Defendants also argue that plaintiffs have not identified an injury in fact that is

2   traceable to the distinct IML provisions they challenge, and which would be redressable

3   by a favorable ruling on the requested injunctive relief.  Defendants assert that plaintiffs

4   cannot plausibly allege a "certainly impending" injury traceable to the passport identifier

5   provisions, because the provisions have not yet been implemented, and a number of

6   steps must first be completed, including development of the process required under IML

7   § 9, completion of a plan for implementation, promulgation of regulations, issuance of

8   guidance, and submission to Congress and approval by congressional committees.

9       With regard to the notification provision, defendants note that both the USMS and

10  ICE HSI have had international notification provisions in place for over five years, and

11  that representatives of those agencies have indicated that they do not anticipate that the

12  nature of the notifications will change as a result of the implementation of the IML.  See

13  Lechleitner Decl. ¶ 14; Mayo Decl. ¶ 10.  Defendants contend that even if the court were

14  to enjoin implementation of the IML's notification provisions, USMS and ICE HSI would

15  continue to provide international notifications under existing authorities.  Thus, any action

16  to halt enforcement of the IML would not redress the plaintiffs' claimed injury.

17      The court finds that plaintiffs have failed to establish standing, because they have

18  not alleged a certainly impending injury fairly traceable to the IML provisions that they

19  challenge, or which is redressable by the relief sought in the FAC.  Because the passport

20  provisions are not yet in effect (and the procedures have not been finalized), plaintiffs

21  cannot show a certainly impending injury.  A plaintiff who challenges a statute must

22  establish "a realistic danger of sustaining a direct injury as a result of the statute's

23  operation," Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979), and

24  that the alleged injury is not too "imaginary" or "speculative," Thomas v. Anchorage Equal

25  Rights Comm'n, 220 F.3d 1134, 1139 (9th Cir. 1999).

26

27  ───────────────────────────────────────────────

28  country he identifies as an intended destination – for the next 2-7 years, FAC ¶ 18; DOE #7 indicates that he will want to travel to Iran after his father's death, FAC ¶ 19, but his father is still alive and DOE #7 does not indicate that his father's death is imminent.

19

Here, however, the Secretaries of State and Homeland Security have not completed the steps required as part of the statutory language to implement these provisions.  Plaintiffs speculate regarding the possible impact of a passport identifier, suggesting that individuals carrying such passports will be at risk of harm from unknown third parties.  Such speculation cannot provide a basis for challenging the statute when the identifier provisions have not even been implemented.  Because it is unknown what form the identifier will take, or any of the other details previously discussed, plaintiffs cannot show that they will suffer hardship if the court withholds review.

As for the notification provisions, procedures for providing Angel Watch notifications were in place well before the enactment of the IML.  See Lechleitner Decl. ¶¶ 5, 7.  The USMS could continue to provide international notifications regarding sex offenders under the preexisting practice, absent the IML.  Thus, plaintiffs fail to show that enjoining the IML would redress their claimed injuries.

Plaintiffs assert that the IML notifications to foreign authorities are "specifically designed to, and actually, result in significant burdens" to plaintiffs' constitutional rights.  However, the FAC pleads no facts showing that the purpose of the IML is to interfere with plaintiffs' constitutional rights.  The stated purpose of the IML is to "protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism."  The notification and registration requirements of the IML are built on existing programs – in particular, SORNA, which has been in place for ten years.  Moreover, the IML does not authorize DHS, USMS, or the Department of State to combine the notifications with any attempt to coerce or even persuade foreign authorities to take any particular action, nor even suggest that they do so.

The court finds that plaintiffs have not established standing because they have not alleged facts showing a "concrete" injury – an injury that is "de facto" and "real, not abstract," and also "actual or imminent" (and "certainly impending") – and which is traceable to the IML's passport identifier and notification provisions, and which would be redressable by the relief requested.

b.     Ripeness

Defendants argue that plaintiffs' challenge to the passport identifier provisions is unripe, because the provisions are not yet effective and will not be effective until the Secretaries of State and Homeland Security and the Attorney General have developed a process for implementation, have submitted a joint report to Congress, and have certified that the process has been completed; and the Secretary of State has promulgated regulations.  In addition, defendants assert, it is not clear at the present what form the implementing regulations will take, what form the actual identifier will take, or who will be required to carry a passport with an identifier.

In opposition, plaintiffs argue that they assert only a facial challenge to the passport identifier provision.  They contend that issues regarding the development and appearance of the identifier are irrelevant, because their claim presents only legal issues and does not turn on the identifier's ultimate appearance or placement, or the identifier's consequence for any specific plaintiff – that is, that they challenge the constitutionality of "any" conspicuous unique identifier authorized by the IML, regardless of form, placement, or regulations promulgated to achieve this statutory mandate.  Thus, they assert, the regulatory procedures and other steps listed in the statute, which defendants must follow or complete before the initiation of the identifier, are irrelevant and do not implicate ripeness because the "facial challenge" does not turn on any of those things.  They claim that a "delay in implementation" of a law may be sufficient to render an as-applied claim unripe, but does not render a facial claim unripe.

The court finds that plaintiffs have failed to establish that their challenges to the passport identifier provision are ripe.  The argument that the claims are ripe because plaintiffs are mounting only a facial challenge simply accentuates the lack of ripeness, since a court cannot facially invalidate (in all applications) a law that has yet to be fleshed out and implemented.  Indeed, the Ninth Circuit in Ariz. v. Atchison T. & S.F.R. Co., 656 F.2d 398 (9th Cir. 1981) (a case cited by plaintiffs) emphasizes that a disagreement "must not be nebulous or contingent but must have taken on fixed and final shape so that

21

1    a court can see what legal issues it is deciding, what effect its decision will have on the

2    adversaries, and some useful purpose to be achieved in deciding them." Id. at 402.

3    Thus, a plaintiff must establish "a realistic danger of sustaining a direct injury as a result

4    of the statute's operation." United Farm Workers Nat'l Union, 442 U.S. at 298.

5         Plaintiffs cite several cases in support of their argument, but none of the cited

6    authority is persuasive under the facts of this case.  For example, Abbot Labs v. Gardner,

7    387 U.S. 136 (1967), which plaintiffs cite in support of the general proposition that the

8    ripeness doctrine exists to prevent the premature adjudication of disputes when

9    additional time or factual development is necessary to resolve the claim, is factually

10   distinguishable from the present case.

11        Abbot Labs involved a challenge brought by drug companies under the

12   Administrative Procedures Act to regulations promulgated by the Secretaries of HEW and

13   the FDA, relating to the labeling of drugs, pursuant to an amendment to the federal Food,

14   Drug, and Cosmetic Act.  The drug companies challenged the regulations on the ground

15   that the Commissioner of Food and Drugs had exceeded the authority granted under the

16   statute.  The Third Circuit found that no actual case or controversy yet existed because

17   no threat of enforcement faced the plaintiffs.

18        The Supreme Court held that even though the regulations had not yet been

19   implemented, the case was suitable for judicial review because such implementation

20   would require an immediate and significant change in the drug companies' conduct of

21   their business affairs, with serious penalties imposed for noncompliance.  Id. at 148-49.

22   Among other things, the Court stated that whether a dispute is ripe depends on "the

23   fitness of the issues for judicial decision" and the "hardship to the parties" of withholding

24   review.  Id. at 149.  The Court noted that while the regulatory scheme was not yet fully in

25   place, the regulations themselves had been finalized and as such constituted "final

26   agency action" for purposes of judicial review.  Id. at 151-53.

27        By contrast, the present case does not involve a challenge under the APA, but

28   rather a constitutional challenge to a statute which, in addition to providing for a passport

United States District Court
Northern District of California

1    identifier and notification to foreign authorities of the travel plans of registered child sex

2    offenders, includes a procedure to be followed by the Secretaries of Homeland Security

3    and State in connection with implementing the provisions.  However, plaintiffs have not

4    established that the mandated process has been completed.  There is no final agency

5    action, and no regulations or guidance, and it is not yet known what form the identifier

6    provision will take or how it will be implemented.  Thus, the issues are not yet fit for

7    judicial decision – as further evidenced by plaintiffs' inability to articulate in their prior

8    motion for preliminary injunction what it was they wanted the court to enjoin.[3]  Thus, apart

9    from presenting the general standard, <u>Abbot</u> provides no support for plaintiffs' position.

10        The next two cases cited by plaintiffs are equally unhelpful to their position.  <u>Ariz.

11   v. Atchison, T. & S.F. Ry. Co.</u> involved a challenge to a statute relating to a method of

12   assessing railroad property.  Arizona filed suit in August 1978, which was six months

13   before the effective date of the statute.  The court held that even though the statute was

14   not yet effective, the court had subject matter jurisdiction because the inevitability of the

15   operation of the statute vis-à-vis the State of Arizona was clear, and the issues were

16   concrete.  <u>Id.</u>, 659 F.2d at 402-03.  Here, by contrast, because the regulations – which

17   are specifically required by the statutory language – have not been promulgated, and the

18   process for implementation has not yet been determined, the operation of the IML's

19   passport identifier provisions is not clear, the issues are not concrete, and the dispute

20   cannot be adjudicated.

21        In <u>Cent. Delta Water Agency v. U.S.</u>, 306 F.3d 938 (9th Cir. 2002), state agencies

22   and local farmers filed suit against the U.S. Bureau of Reclamation, challenging a plan to

23   provide for release of water from a reservoir to comply with a federal statute imposing fish

24   habitat restoration requirements.  The case involved questions whether the farmers had

25   _____

26   [3]  As for plaintiffs' contention that the fact that the process mandated by the statute has
     not been completed is irrelevant, because details of the operation of the passport
27   identifier would be germane only to an as-applied challenge (not asserted here), the court
     notes that for reasons discussed with regard to defendants' motion to dismiss for failure
28   to state a claim, plaintiffs cannot state a plausible claim that the passport identifier is
     unconstitutional on its face.

United States District Court
Northern District of California

1  established injury-in-fact for constitutional standing to challenge the plan, whether the

2  state agencies had associational standing to challenge the plan, and whether the action

3  was barred by claim preclusion.  See id. at 946-53.  There is no discussion of the doctrine

4  of ripeness in this case.

5      The two cases cited by plaintiffs in support of the proposition that a facial

6  challenge that turns on legal issues and requires no factual development is ripe for

7  review are also inapposite.  Hotel Emps. & Restaurant Emps. Int'l Union v. Nevada

8  Gaming Comm'n, 984 F.2d 1507 (9th Cir. 1993), involved a facial challenge to state

9  gaming regulations, based on the legal argument that the regulations were preempted by

10 federal labor statutes.  The court found that the case was ripe for review because the

11 gaming regulations clearly applied to the plaintiff labor unions and union personnel, who

12 would not be aided by awaiting a fuller record.  Id. at 1512-13.

13     Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431 (9th Cir. 1996), involved

14 a facial challenge to federal regulations that restricted travel to Cuba to persons or

15 entities who had applied for and received a license to do business with Cuba, and also

16 presented pure questions of law.  The court found that the case was ripe even though the

17 plaintiff organization had never applied for (and thus had never been denied) a license

18 under the regulations, because the issues were pure questions of law that require no

19 factual development, and the criminal penalties under the regulations would potentially

20 subject the organization to sufficient hardship.  Id. at 1434-36.

21     Here, by contrast, the passport identifier provisions of the IML are not yet in effect,

22 and it is not clear who would be subject to the passport identifier provision, what form the

23 identifier would take, or how it would be employed.  As described above, the plain

24 language of IML §§ 8-9 specifically instructs the Secretaries of Homeland Security and

25 State and the Attorney General to "develop a process by which to implement" the

26 notification and passport identifier provisions, and to "jointly submit a report to, and . . .

27 consult with" specified "appropriate congressional committees" regarding that process,

28 and to certify to Congress that the process has been successfully implemented.  This is

United States District Court
Northern District of California

not a simple matter of regulations not having been promulgated.  Rather, the conditions set forth in the statutory language have not yet been met, and absent that, at a minimum, plaintiffs cannot mount a facial challenge and the passport identifier claims are not ripe.

The Ninth Circuit's reasoning in <u>Thomas</u> is instructive.  In that case, a group of landlords brought an action against human rights officials of the State of Alaska and the City of Anchorage, alleging that enforcement of state laws prohibiting marital status discrimination would violate the landlords' rights to free speech and freedom of religion. The Ninth Circuit held that the case was not ripe for review because the expressed "intent" of the landlords to violate the law on some uncertain day in the future, if and when an unmarried couple attempted to lease one of their rental properties, was not a concrete plan to violate the law, and there was no threat of enforcement against the landlords, who did not claim to have previously violated the law.  <u>See</u> <u>id.</u>, 220 F.3d at 1139-41.

The court emphasized that the threat of enforcement must be "credible," not "simply imaginary or speculative," that in the case before the court, the plaintiffs did not claim to have been threatened with prosecution, or that prosecution was even likely.  <u>Id.</u> The court added that even if the action presented a ripe case/controversy, the court would decline to exercise jurisdiction under the prudential component of the ripeness doctrine, since the issues presented were not purely legal, and the record was devoid of specific factual context, with the landlords' claim resting on hypothetical situations with hypothetical tenants.  <u>Id.</u> at 1141-42.

Here, given the requirements in the statute, as discussed above, the court finds that plaintiffs have not established that the claim is ripe for review.

B.      Motion to Dismiss for Failure to State a Claim

1.      Legal standard

A motion under Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the sufficiency of the complaint.  <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  A pleading must contain "a short and plain statement of the claim showing that the pleader

is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  That is, Rule 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted).  Although particular detail is not generally necessary, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face."  Id. at 556-57.  A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or to allege sufficient facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  The allegations in the complaint "must be enough to raise a right to relief above the speculative level[,]" and the complaint must be dismissed if it does not proffer enough facts to state a claim for relief that is plausible on its face.  Twombly, 550 U.S. at 555, 558-59 (citations and quotations omitted).  While the court accepts as true all factual allegations in the complaint, legally conclusory statements, not supported by facts, need not be accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. at 679.  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

When deciding whether to grant a motion to dismiss for failure to state a claim, the court generally "may not consider any material beyond the pleadings."  Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

1  However, the court may consider material submitted as part of the complaint or relied

2  upon in the complaint, and may also consider material subject to judicial notice.  See Lee

3  v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001).

4          2.     Defendants' motion

5          Defendants argue that all eight causes of action asserted in the FAC should be

6  dismissed for failure to state a claim.  While the court finds that it lacks subject matter

7  jurisdiction because plaintiffs have not established that they have standing and because

8  the claim regarding the passport identifier is not ripe, the court also briefly addresses the

9  arguments raised with regard to whether the complaint states a claim.

10          a.     Compelled speech

11          In the first cause of action, plaintiffs assert a claim of compelled speech, in

12  violation of the First Amendment, alleging that implementation of the IML's passport

13  identifier provision will compel "covered individuals" to publicly communicate their status

14  as convicted sex offenders on their passports.  Defendants contend that this cause of

15  action should be dismissed because the passport identifier provision does not compel

16  speech in violation of the First Amendment.

17          The First Amendment provides in part that "Congress shall make no law . . .

18  abridging the freedom of speech."  U.S. Const. amend. I.  The First Amendment protects

19  against prohibitions of speech, and also against laws or regulations that compel speech.

20  "Since all speech inherently involves choices of what to say and what to leave unsaid,

21  one important manifestation of the principle of free speech is that one who chooses to

22  speak may also decide what not to say."  Hurley v. Irish-Am. Gay, Lesbian, and Bisexual

23  Grp. of Boston, 515 U.S. 557, 573 (1995) (citations and quotations omitted); see also

24  Wooley v. Maynard, 430 U.S. 705, 714 (1977) (same).

25          The test of whether the state has violated an individual's right to refrain from

26  speaking is "whether the individual is forced to be an instrument for fostering public

27  adherence to an ideological point of view he finds unacceptable."  See Wooley, 430 U.S.

28  at 715.  Thus, in Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), the Supreme Court held

United States District Court
Northern District of California

27

United States District Court
Northern District of California

1  that a state statute that required public school students to honor the U.S. flag both with

2  words and traditional salute gestures constituted compelled speech in violation of the

3  First Amendment.  Id. at 633-34.  In Frudden v. Pilling, 742 F.3d 1199 (9th Cir. 2014), the

4  Ninth Circuit found that a public school's uniform policy, which required children to wear

5  shirts with the school logo and a message stating "Tomorrow's Leaders" compelled

6  speech and this was subject to strict scrutiny.  Id. at 1205.

7       Defendants contend that plaintiffs' First Amendment interests are not implicated

8  here because the factual information in a U.S. passport is government speech that

9  cannot reasonably be attributed to – nor viewed as an endorsement by – the passport

10  holder.  Moreover, defendants argue, even if First Amendment interests were implicated,

11  the government has a compelling interest supporting the IML's passport identifier

12  provisions – protecting children from sexual exploitation.

13       The information contained in a passport is unquestionably government speech.

14  The United States – not the passport holder – controls every aspect of the issuance and

15  appearance of a U.S. passport.  A U.S. passport is a government-issued document.  See

16  22 U.S.C. § 211a).  The function of a passport is to serve as a "letter of introduction in

17  which the issuing sovereign vouches for the bearer and requests other sovereigns to aid

18  the bearer" and as a "travel control document" representing "proof of identify and proof of

19  allegiance to the U.S."  Haig v. Agee, 453 U.S. 280, 292-93 (1981).

20       Passports remain government property even when held by individuals, and must

21  be surrendered to the U.S. government upon demand.  See 22 C.F.R. §§ 51.7(a), 51.66.

22  Individuals have no editorial control over the information in a passport; only the U.S.

23  government may amend a passport.  See 22 C.F.R. § 51.9.  Indeed, criminal penalties

24  are imposed on individuals who mutilate or alter their passports.  See 18 U.S.C. § 1543.

25       Plaintiffs do not dispute that the passport identifier is "government speech," and

26  appear to agree that the government is not seeking to compel the passport holder to

27  carry a hostile or inconsistent message of a third party.  Notwithstanding this, plaintiffs

28  argue that the speech at issue is compelled speech because it communicates a message

1 – the fact that the passport holder is a registered child sex offender – which the passport

2 holder is unwilling to have placed on the passport.  Plaintiffs contend that the issue is

3 whether the government may "compel" the plaintiffs to "bear the government's message."

4     Plaintiffs attempt to analogize the facts of this case to the facts in Wooley v.

5 Maynard, 430 U.S. 705 (1977); and Gralike v. Cook, 191 F.3d 911 (8th Cir. 1999).  In

6 Wooley, the Supreme Court held that an individual could not be penalized for blocking

7 out the portion of his automobile license plate that contained the official motto of the State

8 of New Hampshire – "Live Free or Die" – because "the right of freedom of thought

9 protected by the First Amendment . . . includes both the right to speak freely and the right

10 to refrain from speaking at all[,]" which are "complimentary components of the broader

11 concept of 'individual freedom of mind.'"  Id., 430 U.S. at 714.

12     In Gralike, a prospective congressional candidate filed suit against the Missouri

13 Secretary of State, challenging the placement on the ballot of a label "Disregarded

14 Voters' Instruction on Term Limits," which appeared on the ballot pursuant to an

15 amendment to the Missouri Constitution requiring that any failure of United States

16 Senators or Representatives to use their authority to amend U.S. Constitution to impose

17 term limits would be noted on the ballot, and that any failure of nonincumbent candidates

18 for those offices to pledge to support term limits would be noted on the ballot.  The Eighth

19 Circuit ruled that the ballot label constituted compelled speech in violation of the First

20 Amendment because it forced political candidates to speak in favor of the issue of term

21 limits, and precluded them from remaining silent on the issue.  Id., 191 F.3d at 917-21.

22     Plaintiffs also cite PG&E v. Pub. Utils. Comm'n of Cal., 475 U.S. 1 (1986), a case

23 in which the Public Utilities Commission of the State of California attempted to impose a

24 requirement on PG&E – a privately owned utility company – to apportion space in its

25 billing envelopes for inserts by a public consumer group whose views were opposed (and

26 even hostile) to those of PG&E.  While this was not a case involving government speech,

27 plaintiffs cite it as an example of how the compelled speech doctrine exists to prevent

28 "forced association with potentially hostile views.  Id. at 18.  In particular, the Court found

1    that PG&E would effectively be forced "either to appear to agree with [the third parties']

2    views or to respond."  Id., 475 U.S. at 14-15 & n.12.

3          Plaintiffs also assert that the passport identifier is not limited to factual information,

4    because in their view the identifier will falsely communicate that the passport holder has

5    engaged in or is likely to engage in sex trafficking and sex crimes.  They claim that the

6    FAC pleads facts consistent with the compelled speech doctrine, and that defendants

7    have provided no authority showing that plaintiffs' entitlement to recovery is foreclosed as

8    a matter of law.

9          The court finds that the first cause of action fails to state a claim.  First, the

10   passport identifier required by the IML constitutes government speech and therefore the

11   requirement does not implicate First Amendment interests.  The Free Speech Clause

12   restricts government regulation of private speech – it does not regulate government

13   speech.  See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009) (city's

14   refusal to allow religious organization to erect monument in public park in which a number

15   of displays including a privately donated Ten Commandments monument already stood

16   did not violate First Amendment because the city was exercising a form of government

17   speech not subject to scrutiny under Free Speech Clause).

18         To the extent that a passport communicates information, it does so on behalf of

19   the issuing government, not the passport holder.  If federal law permitted individuals to

20   communicate their own messages in their passports, or control the information that

21   passports contain, those documents would cease to function as reliable government-

22   issued identification.  The cases cited by plaintiffs – Wooley and Gralike – involved

23   government speech containing an "ideological message" or a political position which

24   implicated the First Amendment because the government's point of view would be

25   attributed to – or deemed to be endorsed by – the private party.

26         It is well established that "the government can speak for itself."  Bd. of Regents v.

27   Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229 (2000).  The passport identifier is a

28   mark – the form of which is as-yet undetermined – to be placed by the government on the

United States District Court
Northern District of California

1  U.S. passports of certain individuals who were convicted of sex crimes involving minors.

2  However, it is a statement of fact which does not communicate any ideological or political

3  message.  Factual information regarding a criminal conviction is not equivalent to an

4  ideological message on a license plate or a ballot.  A mark on a passport identifying the

5  holder as a registered sex offender is neither an "opinion" which is being attributed to the

6  passport holder, nor a misleading statement.  Registered sex offenders had a full and fair

7  opportunity to challenge the criminal charges at the time they were brought.  They cannot

8  now argue that there is any dispute regarding their status as offenders.

9       Nor can the identifier reasonably be interpreted as an expression of agreement

10  with the government's position regarding sex trafficking.  Thus it differs from, for example,

11  the placement of the "Live Free or Die" motto on the New Hampshire license plate in

12  Wooley, where the plate (with registration number and year) was government speech, but

13  the motto was an ideological or political statement.  Moreover, while it is true that there

14  are cases holding that a law compelling "factual" speech may be unconstitutional, see

15  Riley v. Nat'l Fed'n for the Blind, 487 U.S. 781, 797-98 (1988) (state law requiring

16  fundraisers to disclose to potential donors what percentage of funds they raised actually

17  went to charities); Nat'l Ass'n of Mfrs. v. SEC, 800 F.3d 518 (D.C. Cir. 2015) (SEC

18  regulation requiring disclosure to investors that company used "conflict minerals"), those

19  cases are distinguishable because the laws or regulations at issue required the speaker

20  to communicate the government's message relating to controversial social or political

21  issues, not mere facts relating to criminal convictions.

22       In this case, Congress has determined that the Secretary of State shall place an

23  identifier on the passports of certain persons convicted of sex offenses involving minors

24  in order to identify those persons as convicted sex offenders when they cross

25  international borders.  It is not the speech of the passport holder that is at issue, any

26  more than the speech of the holder of a government-issued identification card is at issue

27  with regard to identifiers such as name, date of birth, height, weight, or eye color.

28  Moreover, contrary to plaintiffs' arguments, the identifier is not a public communication

and will not even be displayed to the public.  The U.S. passport itself is not speech, and the passport identifier does not suggest or imply that the passport-holder has adopted or is sponsoring an ideological or political point of view.  Thus, the court finds that plaintiffs have failed to state a claim with regard to the First Amendment compelled speech claim.

b.    Substantive due process and equal protection

In the second cause of action, plaintiffs allege violation of substantive due process under the Fifth Amendment, based on the projected enforcement of the IML's notification and passport identifier provisions against all individuals convicted of sex offenses involving a minor, without regard for the details of those offenses or the current threat posed by each such individual to public safety, and based on the right to be free from governmental "stigmatization" of the "covered individuals."  FAC ¶¶ 59-60.  They assert that the notification and passport identifier provisions "bear[ ] no rational relationship to the State's goal of protecting the public."  FAC ¶ 59.

In the sixth cause of action, plaintiffs allege violation of equal protection under the Fifth Amendment, based on the implementation of the notification and passport identifier provisions.  They allege that individuals convicted of sex offenses in the United States "constitute a discrete and insular minority that is uniquely subject to public and private discrimination, and whose rights are uniquely subject to unconstitutional deprivation by state action, including state action that is motivated by malice [and] that is arbitrary and discriminatory[.]"  FAC ¶ 77.  They assert that the IML's notification and passport identifier provisions "are not rationally related to any legitimate government purpose, and are not sufficiently tailored to serve any legitimate government purpose."  FAC ¶ 80.  In addition, they assert, because the IML applies these two provisions to "all individuals convicted of a sex offense involving a minor without regard for the individual circumstances of those offenses or the legitimate needs of public safety," it constitutes "arbitrary, capricious, and unreasonable government action" in violation of the Equal Protection Clause.  FAC ¶ 81.

Defendants contend that the second and sixth causes of action must be dismissed

United States District Court
Northern District of California

United States District Court
Northern District of California

1   for failure to state a claim.  They argue that plaintiffs have not identified any fundamental

2   right that is or will be violated by either the passport identifier provisions or the notification

3   provisions, and assert that the Ninth Circuit has repeatedly found that individuals

4   convicted of serious sex offenses do not have a fundamental right to be free from sex

5   offender registration and notification requirements, and are not considered members of a

6   suspect or protected class.  They argue further that even were it the case that the

7   passport identifier and notification provisions implicate a liberty interest, those provisions

8   readily withstand rational basis review.

9          In opposition, plaintiffs assert that the substantive due process and equal

10   protection claims are adequately pled.  They concede that these claims are not subject to

11   strict scrutiny, but rather are appropriately subject to rational basis review, as the claims

12   at most implicate plaintiffs' liberty interests.  They also argue, however, that courts apply

13   a "more searching form of rational basis review" where a law displays animus or

14   disregard toward a particular group of politically unpopular people in connection with the

15   group's exercise of a fundamental right.  They maintain that the claims are adequately

16   pled "based on numerous cases that strike down analogous restrictions on socially

17   disfavored populations where the basis for those restrictions is arbitrary, irrational, and

18   disproportionately harmful."

19          The Due Process Clause protects individual liberty against "certain government

20   actions regardless of the fairness of the procedures used to implement them." Daniels v.

21   Williams, 474 U.S. 327, 331 (1986).  The due process guarantees of the Fifth and

22   Fourteenth Amendments apply "only when a constitutionally protected liberty interest or

23   property interest is at stake." Tellis v. Godinez, 5 F.3d 1314, 1316 (9th Cir.1993).

24   "Substantive" due process prevents the government from engaging in conduct that

25   "shocks the conscience," Rochin v. California, 342 U.S. 165, 172 (1952), or interferes

26   with rights "implicit in the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319,

27   325-326 (1937).

28          "To establish a substantive due process claim, a plaintiff must, as a threshold

1    matter, show a government deprivation of life, liberty, or property." Nunez v. City of L.A.,

2    147 F.3d 867, 871 (9th Cir. 1998).  In addition, the court must consider whether the

3    alleged deprivation abridges a fundamental right.  See Reno v. Flores, 507 U.S. 292, 302

4    (1993).  If it does, the statute at issue will be subject to strict scrutiny and is invalidated

5    unless it is "narrowly tailored to serve a compelling state interest." Id.  Where no

6    fundamental right is implicated, a challenged law must be upheld so long as it is

7    "rationally related to a legitimate government goal." Sylvia Landfield Tr. v. City of L.A.,

8    729 F.3d 1189, 1191 (9th Cir. 2013); see also Washington v. Glucksberg, 521 U.S. 702,

9    722 (1997).

10         While the Fifth Amendment does not include an explicit equal protection provision,

11   "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it

12   the prohibition against denying to any person the equal protection of the laws." U.S. v.

13   Windsor, 133 S. Ct. 2675, 2695 (2013); U.S. v. Navarro, 800 F.3d 1104, 1115 (9th Cir.

14   2015).  Thus, Fifth Amendment equal protection claims are treated the same as

15   Fourteenth Amendment equal protection claims.  Navarro, 800 F.3d at 1112 n.6.

16         Under the Fourteenth Amendment's Equal Protection Clause, persons who are

17   similarly situated must be treated alike.  City of Cleburne v. Cleburne Living Ctr., Inc., 472

18   U.S. 432, 439 (1985).  An equal protection claim may be established by showing that a

19   state actor intentionally discriminated against the plaintiff based on his membership in a

20   protected class, Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1123 (9th Cir.

21   2013), or that similarly situated individuals were intentionally treated differently without a

22   rational relationship to a legitimate state purpose, Engquist v. Ore. Dep't of Agric., 553

23   U.S. 591, 601-602 (2008).

24         Laws alleged to violate the Equal Protection Clause are subject to either strict

25   scrutiny, intermediate scrutiny, or rational basis review.  Kahawaiolaa v. Norton, 386 F.3d

26   1271, 1277 (9th Cir. 2004).  Strict scrutiny applies if the aggrieved party is a member of a

27   protected or suspect class, or otherwise suffers the unequal burdening of a fundamental

28   right. City of Cleburne, 473 U.S. at 439-40.  Intermediate scrutiny applies when a law

United States District Court
Northern District of California

34

1    discriminates based on a quasi-suspect classification, such as gender.  Kahawaiolaa,

2    386 F.3d at 1277.  Absent allegations of membership in a suspect or quasi-suspect class

3    or the burdening of a fundamental right, courts apply a rational basis test.  Id.at 1277-78;

4    see also Litmon, 768 F.3d at 1242.  "Government actions that do not . . . involve suspect

5    classifications will be upheld if [they] are rationally related to a legitimate state interest."

6    Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1208 (9th Cir. 2005).

7         The Ninth Circuit has repeatedly recognized that individuals convicted of serious

8    sex offenses do not have a fundamental right to be free from sex offender registration

9    and notification requirements.  See Litmon, 769 F.3d at 1241-42; Juvenile Male, 670 F.3d

10   at 1012; Tandeske, 361 F.3d at 597.  Nor is there any fundamental right for a convicted

11   sex offender to avoid publicity, Juvenile Male, 679 F.3d at 1012, or the transmission of

12   accurate information regarding such conviction or registration to authorities in a foreign

13   country to which such individual wishes to travel.

14        Further, the Supreme Court has rejected the notion that any stigma associated

15   with conviction as a sex offender is attributable to registration or notification

16   requirements.  Smith, 538 U.S. at 98, 101 (stigma or other consequences "flow not from

17   [Alaska law's] registration and dissemination provisions, but from the fact of conviction,

18   already a matter of public record"); Conn. Dep't of Pub. Safety, 538 U.S. at 6-8 (public

19   disclosure of Connecticut's sex offender registry, which is based on fact of previous

20   conviction, does not constitute violation of due process, nor does "mere injury to

21   reputation").

22        In any event, plaintiffs concede in their opposition to defendants' motion that the

23   FAC alleges no violation of a fundamental right, and that the challenged provisions of the

24   IML are subject to rational basis review for purposes of substantive due process and

25   equal protection analysis.  Plaintiffs argue both that the IML is not a rational or

26   constitutionally appropriate means of pursuing the government's interest, and that the

27   question of the rationality of the IML's operation raises disputed factual issues which

28   cannot be resolved in a 12(b)(6) motion.  They claim that they will produce "additional

United States District Court
Northern District of California

United States District Court
Northern District of California

1  evidence" of the IML's irrationality, including documents published by various state sex

2  offender management boards and experts in the field of sex offender recidivism and

3  treatment who previously submitted declarations in support of plaintiffs' motion for

4  preliminary injunction.

5     Plaintiffs argue that the irrationality of the IML is further demonstrated by the fact

6  that the Congressional findings in support of its passage are "conclusory and thin," and

7  are based on the "irrational assumption that sex offenders constitute one monolithic and

8  homogenous class of people to whom blanket legal restrictions can be uncritically applied

9  without attention to their current risk to public safety."  Plaintiffs contend that courts have

10  recognized that the label "sex offender" does not amount to evidence of future risk.  They

11  assert that because the IML does not make any meaningful distinction among those

12  labeled "sex offenders" – and because it targets a "socially disfavored" group – their

13  substantive due process and equal protection claims should be permitted to proceed.

14     The court finds that the second and sixth causes of action fail to state a claim.

15  With regard to the equal protection claim, it is undisputed that convicted sex offenders do

16  not constitute a protected group or a suspect class which would trigger strict scrutiny.

17  See Juvenile Male, 670 F.3d at 1009; U.S. v. LeMay, 260 F.3d 1018, 1030-31 (9th Cir.

18  2001).[4]  Government actions that do not involve suspect classifications or a fundamental

19  right will be upheld if they are rationally related to a legitimate state interest.  Fields v.

20  Palmdale Sch. Dist., 427 F.3d 1197, 1208 (9th Cir. 2005).

21     With regard to the substantive due process claim, under rational basis review, a

22  challenged statute must bear only a "reasonable relation to a legitimate state interest."

23  Glucksberg, 521 U.S. at 722.  Plaintiffs have alleged no facts sufficient to show a liberty

24  interest in preventing U.S. authorities from transmitting accurate information about

25  individuals' criminal histories to parallel authorities in countries where these individuals

26  plan to travel.  Moreover, even assuming such a liberty interest exists, the IML's

27

28  [4]  Nor, for reasons stated below, do they constitute a quasi-suspect class which would
trigger intermediate scrutiny.

United States District Court
Northern District of California

notification and passport identifier provisions are rationally related to government

interests in preventing U.S. persons from committing acts of sexual abuse or exploitation

in other countries and in facilitating cooperation with and reciprocal notifications from

other countries.

In enacting the IML, Congress found the notifications necessary to inform

destination countries that a registered sex offender intends to travel there, in order to

"protect children and others from sexual abuse and exploitation, including sex trafficking

and sex tourism," to raise awareness of the whereabouts of registered sex offenders who

cross international borders, and to encourage reciprocal notifications about sex offenders

who intend to travel here.  IML, Preamble; see also 73 Fed. Reg. at 38066 (discussing

need for "effective tracking" of registered sex offenders who travel outside the country);

76 Fed. Reg. at 1637 (discussing development of a "system for consistently identifying

and tracking sex offenders who engage in international travel").

The Ninth Circuit has repeatedly found that sex offender registration and

notification provisions are rationally related to legitimate government purposes.  See,

e.g., Litmon, 768 F.3d at 1241-42; Juvenile Male, 670 F.3d at 1009); Tandeske, 361 F.3d

at 597.  While the IML is not a sex offender registration system, it provides for

notifications to foreign authorities based on information contained in sex offender

registries.  The rational basis test is the same under both due process and equal

protection.  Gamble v. City of Escondido, 104 F.3d 300, 307 (9th Cir. 1997).  Here, in

enacting the IML, Congress rationally concluded that the notifications are necessary to

protect children and others from sexual abuse and exploitation.

As for plaintiffs' contention that they should be permitted to submit additional

"evidence" regarding the asserted irrationality of the IML, rational basis review does not

properly involve courts in weighing conflicting expert opinions and engaging in judicial

fact-finding as to whether a statute does or does not serve its intended purposes.  See

FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313-14 (1993) (legislative choice "is not

subject to courtroom factfinding"); Heller v. Doe, 509 U.S. 312, 320 (1993) (government

1    "has no obligation to produce evidence to sustain the rationality of a statutory

2    classification"); U.S. v. Pickard, 100 F. Supp. 3d 981, 1005 (E.D. Cal. 2015) (under

3    rational basis review, a law "may be overinclusive, underinclusive, illogical, and

4    unscientific and yet pass constitutional muster").

5        Rational basis review is "highly deferential." U.S. v. Hancock, 231 F.3d 557, 566

6    (9th Cir. 2000). A law must be upheld under rational basis review "if any state of facts

7    reasonably may be conceived to justify" the classifications imposed by the law.

8    McGowan v. Maryland, 366 U.S. 420, 426 (1961). This lowest level of review does not

9    look to the actual purposes of the law. Instead it considers whether there is some

10   conceivable rational purpose that Congress could have had in mind when it enacted the

11   law. See SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 481 (9th Cir. 2014)

12   Here, the FAC does not allege facts sufficient to show that the IML is not rationally

13   related to a legitimate government purpose.

14       Finally, while the parties did not focus on the question of intermediate scrutiny –

15   which requires a showing that the classification serves important governmental objectives

16   and is rationally related to achievement of those objectives, see Craig v. Boren, 429 U.S.

17   190, 198 (1976) – it appears that plaintiffs may have been attempting to allege in the

18   sixth cause of action that they are members of a "quasi-suspect" class. See FAC ¶ 77

19   ("individuals convicted of sex offenses constitute a discrete and insular minority that is

20   uniquely subject to public and private discrimination . . . ."). In their opposition to the

21   present motion, plaintiffs argue that "numerous cases" have stricken down "analogous

22   restrictions on socially disfavored populations where the basis for these restrictions is

23   arbitrary, irrational, and disproportionately harmful." See Pltfs' Opp. at 19. They argue

24   that "where a vulnerable minority's liberty interests are at issue, rational basis review

25   does not mean blind acceptance of the government's rationale for Congressional action

26   or superficial assertions that the legislation serves a government interest." Id. at 21.

27       However, the cases plaintiffs cite in support are inapposite. For example, they cite

28   a recent decision from the California Supreme Court, In re Taylor, 60 Cal. 4th 1019

United States District Court
Northern District of California

38

(2015), in which the court invalidated a state statute imposing mandatory residency restrictions on registered sex offenders, on the basis that blanket enforcement of the restrictions would violate the plaintiffs' fundamental rights to intrastate travel, to establish and maintain a home, to privacy, and to free association within one's home.  See id. at 1036-42.  Plaintiffs have conceded here that the IML does not burden their fundamental rights.

While the court finds no authority for subjecting the challenged provisions of the IML to intermediate scrutiny, the court also finds that in enacting the IML, Congress identified important government objectives – the need to inform destination countries that a registered sex offender intends to travel there, in order to "protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism," to raise awareness of the whereabouts of registered sex offenders who cross international borders, and to encourage reciprocal notifications about sex offenders who intend to travel here – and that the challenged provisions are rationally related to these objectives.

Accordingly, the court finds that plaintiffs have failed to state a Fifth Amendment substantive due process or equal protection claim.

c.     Procedural due process

In the third, fourth, and fifth causes of action, plaintiffs allege violation of procedural due process, under the Fifth Amendment, based on an asserted restriction of the liberty interests inherent in the right to travel, the right to earn an income, and the right to associate with family, which will result from implementation of the notification and passport identifier provisions, and the right to be free of government "stigmatization."

Defendants argue that the third, fourth, and fifth causes of action do not state a claim.  They concede that international travel, employment, and family association generally qualify as liberty interests, but argue that plaintiffs have alleged no facts showing a deprivation of those interests.  They contend that contrary to plaintiffs' allegations, the IML's notification and passport identifier provisions do not establish a "blacklist" that prevents individuals subject to those provisions from traveling, working, or

associating with their families.

The Due Process Clause of the Fifth Amendment provides that "No person shall ... be deprived of life, liberty, or property, without due process of law . . . "  The standard with regard to due process claims (against federal actors) under the Fifth Amendment is the same as with regard to claims (against state actors) under the Fourteenth Amendment.  See Betts v. Brady, 316 U.S. 455, 462 (1942), overruled on other grounds by Gideon v. Wainwright, 372 U.S. 335 (1963).

A claim of violation of procedural due process involves two elements – there must be a liberty or property interest that has been interfered with by the government, and the procedures attendant upon that deprivation must have been constitutionally insufficient. See Carver v. Lehman, 558 F.3d 869, 872 (9th Cir. 2009) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  Thus, to state a claim for violation of procedural due process, plaintiffs must allege a liberty or property interest protected by the Constitution, a deprivation of that interest by the government, and a lack of process. Wright v. Riveland, 219 F.3d 905, 913 (9th Cir. 2000).

Defendants argue that plaintiffs have alleged no facts showing how the IML provisions violate due process, or explaining what additional process is due, but simply rely on general assumptions regarding the reaction of any destination country to any particular notification.  They argue that the Supreme Court in Smith found similar assertions to be "conjecture" because the plaintiffs in that case had provided no facts sufficient to show "substantial" deprivations that registered sex offenders would not have encountered anyway, given that their convictions were already public.  See id., 538 U.S. at 100.

Defendants contend that the allegations that every individual subject to the IML's provisions would be entirely barred from international travel and prevented from working or associating with family members cannot be deemed plausible.  They argue that speculation about hypothetical scenarios is not a proper basis to invalidate a statute on its face.

United States District Court
Northern District of California

1    As for plaintiffs' asserted interest in being "free from governmental stigmatization,"

2    see FAC ¶¶ 65, 74, defendants argue that plaintiffs allege no facts sufficient to state a

3    "stigma-plus" claim.  Such a claim requires allegations of a "public disclosure of a

4    stigmatizing statement by the government, the accuracy of which is contested, plus the

5    denial of some more tangible interest."  See Ulrich v. City & Cnty of S.F., 308 F.3d 968,

6    982 (9th Cir. 2002) (citation omitted).

7    Defendants contend that plaintiffs fail to plausibly allege deprivations of other

8    liberty or property interests, and that nothing in the IML requires or even allows for

9    transmission of inaccurate information, but rather, only accurate information regarding the

10   offenses for which an individual was previously convicted.  Further, they assert, a

11   communication between the government of the United States and foreign governmental

12   authorities cannot plausibly be deemed "public disclosure," particularly where the

13   information is already publicly available in conviction records and sex offender registries.

14   Both the Supreme Court and the Ninth Circuit have held that no additional process

15   is due when a law's requirements "turn on an offender's conviction alone," which "a

16   convicted offender has already had a procedurally safeguarded opportunity to contest."

17   See Conn. Dept. of Pub. Safety, 538 U.S. at 7; see also Juvenile Male, 670 F.3d at 1014;

18   Tandeske, 361 F.3d at 596.  Moreover, the IML in fact does provide advance notice by

19   defining the category of those subject to notifications based on conviction and registration

20   status.  It also provides that the Angel Watch Center and the USMS shall adopt

21   mechanisms to "receive complaints from individuals affected by erroneous notifications"

22   and to take corrective action in the event errors are identified.

23   With regard to defendants' argument that the notifications transmit solely "factual

24   information," plaintiffs contend that the notification process raises factual disputes, and

25   that they should be permitted to conduct discovery to determine the basis upon which

26   DHS and USMS issue notifications to foreign authorities.  With regard to defendants'

27   argument that the notifications are not stigmatizing, and are not widely published,

28   plaintiffs characterize this as a "dispute with the merits" which should not be considered

41

on a 12(b)(6) motion.  They also argue that this position "defies common sense," claiming that nothing could be more stigmatizing than communication of information identifying someone as a convicted sex offender.

The court finds that the third, fourth, and fifth causes of action fail to state a procedural due process claim.  Plaintiffs assert interests in international travel (third cause of action), earning an income (fourth cause of action), and associating with family (fifth cause of action).  However, while each of these qualifies as a liberty interest, plaintiffs have not stated a claim because they have alleged no facts showing that the government has deprived them of the interest at issue.  Nor have they alleged facts showing that the procedures accompanying the alleged deprivation are constitutionally insufficient.

Plaintiffs insist that their challenge is not to the statutes mandating registration of convicted sex offenders, but rather to the IML's provisions for notification to foreign authorities of the fact of those convictions.  Plaintiffs appear to be splitting hairs.  It is undisputed that the constitutional rights of convicted sex offenders are not violated by state and federal civil registration requirements and the public posting of information about those convictions.  See, e.g., Juvenile Male, 670 F.3d at 1013-14.  Plaintiffs have articulated no sound reason for concluding that the communication of that publicly available information by the United States government to foreign authorities could be considered a violation of the due process rights of the registered sex offenders.

Where a law's requirements "turn on an offender's conviction alone – a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest" – no additional process is required for due process.  See Tandeske, 361 F.3d at 596 (rejecting procedural due process challenge to Alaska's sex offender registration and notification statute where additional process would be futile because the only relevant fact to whether registration is required is whether a conviction exists – a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest) (citing Conn. Dep't of Pub. Safety, 538 U.S. at 4-8)); see also U.S. v. Fernandes, 636

United States District Court
Northern District of California

F.3d 1254, 1257 (9th Cir. 2011) (adequate procedural safeguards at the conviction stage are sufficient to obviate the need for any additional process at the registration stage).

As for the "stigma-plus" claim, the court agrees with defendants that transmission of factual information regarding criminal convictions to foreign authorities is insufficient to support such a claim.  The Supreme Court has already found that any sigma associated with convictions for sex offenses is a product of the sex offenders' prior convictions and cannot be attributed to sex offender registration and notification laws.  See Smith, 538 U.S. at 98.  Moreover, plaintiffs nowhere allege that they dispute the accuracy of statements regarding their criminal convictions.

As for plaintiffs' attempt to contest the accuracy of the IML notifications, the court notes that no such allegation appears in the FAC.  Moreover, the IML contains provisions for mechanisms to receive complaints from individuals affected by erroneous notifications, and plaintiffs have alleged no basis for complaining that such mechanisms are inadequate, given that the mechanisms had not even been put into place when plaintiffs filed the present action.

Accordingly, the court finds that the third, fourth, and fifth causes of action fail to state a procedural due process claim.

d.     Ex post facto violation

In the seventh cause of action, plaintiffs allege that applying the notification and passport identifier provisions of the IML constitutes retroactive punishment, particularly on those "covered individuals" who are no longer required to register as sex offenders in any jurisdiction, and that those provisions therefore violate the Ex Post Facto Clause.

Defendants contend that the seventh cause of action should be dismissed for failure to state a claim, because the Supreme Court has already held that sex offender registration and public notification requirements are neither punitive nor excessive.  See Smith, 538 U.S. at 104-05.

The U.S. Constitution prohibits the federal government and the states from passing any "ex post facto Law."  U.S. Const., Art. I, § 9, cl. 3 (federal government); Art. I,

United States District Court
Northern District of California

§ 10, cl. 1 (states).  The Ex Post Facto Clause prohibits any statute that (1) punishes as a crime an act previously committed, which was innocent when done; (2) makes more burdensome the punishment for a crime, after its commission; or (3) deprives one charged with a crime of any defense available according to law at the time when the act was committed.  See Collins v. Youngblood, 497 U.S. 37, 41-46 (1990).  That is, the Ex Post Facto Clause is violated only if the law is punishment, see Russell v. Gregory, 124 F.3d 1079, 1083-84 (9th Cir. 1997); is retrospective, see Lynce v. Mathis, 519 U.S. 433, 441 (1997); and disadvantages the offender by altering the definition of criminal conduct or increasing the punishment for the crime, see id.

In Smith, the Supreme Court held that Alaska's sex offender registration program was a civil regulatory scheme, not a criminal punishment scheme, and that it could thus be imposed retroactively on individuals whose convictions predated the act, without violating the Ex Post Facto Clause.  Id., 538 U.S. at 91-92.  The Ninth Circuit subsequently held that Congress, in enacting SORNA, intended to create a regulatory scheme for the registration of sex offenders – not a scheme of criminal punishment – and, relying on the Supreme Court's decision in Smith, concluded that SORNA could be retroactively applied to individuals whose convictions predated SORNA's enactment. U.S. v. Elkins, 683 F.3d 1039, 1045-49 (9th Cir. 2012).

Here, defendants assert, the notification and passport identifier provisions are far removed from anything that could be deemed punitive, as both provisions constitute communications from the U.S. Government to foreign authorities of accurate information regarding individuals' criminal history, which is already public information.  Defendants reiterate that these requirements are rationally related to important government interests, and that the seventh cause of action should therefore be dismissed.

In opposition, plaintiffs argue that the ex post facto claim is adequately pled.  They contend that defendants have cited no applicable authority in support of the proposition that government "communications schemes" which "irrationally and unjustifiably" deny individuals the right to travel internationally to visit family members and to conduct

1  business, and which subject travelers to a risk of physical harm (because of their status

2  as convicted sex offenders) are not so punitive as to negate the government's intent that

3  the statutory scheme be considered civil.

4     The court finds that the seventh cause of action fails to state a claim for violation of

5  the Ex Post Facto Clause.  Plaintiffs cannot proceed on this claim because there is no

6  basis on which to conclude that the IML's provisions are punitive.  See Smith, 538 U.S. at

7  92-96.

8               e.     Declaratory relief

9     In the eighth cause of action, plaintiffs seek a declaration of their rights with regard

10 to the IML's notification and passport identifier provisions.  Defendants argue that this

11 cause of action should be dismissed because it is entirely derivative of the other causes

12 of action, and thus fails to state a claim for the same reasons that the other seven causes

13 of action fail to state a claim.

14    Plaintiffs do not oppose this argument in their opposition.  Accordingly, for the

15 reasons argued by defendants, the court finds that the eighth cause of action fails to state

16 a claim.

17                              **CONCLUSION**

18    In accordance with the foregoing, defendants' motion is GRANTED.  Because

19 standing and ripeness are determined as of the commencement of the litigation, see

20 Yamada, 786 F.3d at 1203-04; Biodiversity Legal Found., 309 F.3d at 1171, the lack of

21 subject matter jurisdiction compels a dismissal WITH PREJUDICE.  Alternatively, all

22 causes of action fail to state a claim for the reasons stated above.  The court finds that

23 amendment would be futile in light of the lack of subject matter jurisdiction.

24

25 **IT IS SO ORDERED.**

26 Dated:  September 23, 2016

27                                            _____

28                                            PHYLLIS J. HAMILTON
                                             United States District Judge

United States District Court
Northern District of California